**PRUDENTIAL–BACHE SECURITIES, INC., Plaintiff,**

v.

**John C. CULLATHER, Defendant and Third–Party Plaintiff,**

v.

**Thomas V. BLANTON, Jr., et al., Third–Party Defendants.**

**Civ. A. No. 87–0177–R.**

United States District Court, E.D. Virginia, Richmond Division.

Aug. 5, 1987.

Kevin R. Huennekens, John O. Peters, John S. Barr, Maloney, Yeatts & Barr, Richmond, Va., Theodore A. Levine, Wilmer, Cutler & Pickering, Washington, D.C., Stephen F. Black, Karen Getman, Philips D. Anker, for plaintiff.

David Machanic, Pierson, Ball & Dowd, Washington, D.C., for deponent Tauber.

Lawrence E. Luck, Everette G. Allen, Jr., Mahlon G. Funk, Jr., John R. Walk, John C. Ivins, Jr., Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, Va., for defendant.

SPENCER, District Judge.

Prudential–Bache Securities, Inc. ("Pru–Bache") is suing its former customer John C. Cullather to collect Cullather's margin account debit balance, which exceeds $2 million. Cullather has answered the complaint, asserted a counterclaim against Pru–Bache, and brought Thomas V. Blan-

ton, Jr., his account representative at Pru–Bache, and Richard A. Sugarman, Blanton's supervisor, into the suit as third-party defendants.[1] The motion of Pru–Bache, Blanton and Sugarman to dismiss Cullather's counterclaim and third-party complaint is now ripe for decision.

### FACTS AND PROCEDURE

Stating the case in the light most favorable to the nonmoving party, Blanton solicited Cullather to open a margin account at Pru–Bache on or about 5 May 1986. Blanton told Cullather that, for an investment of $5,000, Cullather could realize a "definite gain" on a transaction that had already taken place but had not been assigned to any of Blanton's existing accounts. Cullather deposited $5,000 with Blanton for this purpose on 9 May 1986.

Blanton solicited Cullather to invest in Datacopy Corporation, and Cullather deposited an additional $36,000 which, when added to the original $5,000, represented the amount Blanton had stated to be the margin requirement for the purchase of 10,000 shares of Datacopy. The $41,000 also represented the total amount Cullather intended to invest through Blanton, and Cullather so advised Blanton.

Blanton next solicited Cullather to start trading in the currency options market. Blanton said that he had a profitable but safe strategy involving put and call options on the Swiss franc. Under Blanton's strategy, Cullather would write such puts and calls simultaneously: safety derived from the fact that the opening option was always accompanied by a closing transaction, and profitability from the expectation that the opening premium would exceed the closing premium. Cullather alleges that Blanton told him that this technique was safer than investing in stocks and would

yield an average of 20% annually. However, Blanton did not disclose the fact that his system involved writing naked puts and calls.[2]

Though Cullather did not authorize Blanton to trade any currency options, Blanton commenced writing naked puts and calls on Swiss francs for Cullather's account in May 1986. Cullather began receiving form trade confirmations shortly afterward. Cullather says that he did not object at that time because Blanton had told him that the transactions were safe, and because Cullather believed himself to be at risk only for $41,000. Moreover, Cullather expected to promptly receive a margin call from Pru–Bache if there were any adverse development in his account. Cullather alleges that if he had known all the details, he would have repudiated the transactions.

On 1 August 1986, Cullather received a $24,940.07 margin call from Pru–Bache. Cullather confronted Blanton, who said he had "taken care of it," and that the margin call could be ignored. Cullather did ignore the call, and apparently Blanton did "take care of it."

Around the end of 1986, Blanton reported to Cullather that his margin account contained over $600,000 in premiums collected from options, and that he had earned a profit of over $400,000 for Cullather. In fact, Cullather alleges, his account showed a deficit at the end of 1986 and in every month from July 1986 through January 1987, except November. Blanton was concealing the actual status of Cullather's account by "rolling up" Cullather's exposure. Rolling up is accomplished by committing an account to ever-increasing options and using the resulting premiums to offset losses as they occur. Cullather should have received numerous margin calls from Pru–Bache, but did not. Had he received such calls, Cullather alleges, he would have

---

1. Cullather's counterclaim and third-party complaint each contain claims for equitable rescission, statutory rescission pursuant to Section 29(b) of the Securities Exchange Act (15 U.S.C. Section 78cc(b)), securities fraud under Section 10(b) of the Securities Exchange Act (15 U.S.C. Section 78j(b)) and Rule 10b–5, securities fraud under the Virginia Securities Act (Va.Code Section 13.1–501 *et seq.*), common law fraud,

breach of contract, civil RICO (based on violations of 18 U.S.C. Sections 1962(b), (c), and (d)), conversion, negligence and gross negligence, and "counterclaim preservation."

2. A put or call is "naked" when the option writer (Cullather in this case) does not own the underlying asset at the time of writing.

taken steps to terminate activity in his account.

On 15 January 1987, Blanton advised Cullather a deposit of between $50,000 and $100,000 in the account would give Blanton some "latitude" and enable him to earn additional profits for Cullather. Blanton also indicated that this additional money could be borrowed from Commonwealth Bank, of which Blanton was a director.

At a meeting with Blanton on 22 January 1987, Cullather was advised for the first time that his account had a negative net worth. Blanton showed Cullather a sheet listing multiple accounts; the figure $800,-000 appeared by an account number Blanton identified as Cullather's. Blanton neither identified this as a margin call nor demanded payment. Cullather instructed Blanton to terminate and liquidate all currency transactions.

Cullather met again with Blanton on the following day. To cover losses he had incurred in unrelated transactions, Cullather tendered $100,000, which Cullather alleges Blanton accepted in full settlement of his account. This $100,000 was a loan from Commonwealth Bank arranged by Blanton. Meanwhile, Blanton continued committing to puts and calls in Cullather's account despite Cullather's instructions. During the entire period at issue, Blanton generated $525,433.65 in commissions on allegedly unauthorized trading in Swiss francs alone. Altogether, as stated above, the loss in Cullather's account exceeds $2 million.

At Blanton's insistence, and in further settlement of his account, Cullather authorized the transfer of his $89,000 Paine Webber account to Pru–Bache. Upon learning that certain facts on which his decision to transfer had been predicated were not as Blanton had represented them to be, Cullather rescinded his transfer authorization. After Cullather's rescission and with full knowledge of it, Pru–Bache nevertheless transferred Cullather's Paine Webber account to itself, and has retained and executed transactions in the account.

**3.** This figure consists of $41,000, Cullather's initial deposits to the account, plus $100,000, the loan from Commonwealth Bank, plus $89,000,

## I. THIRD–PARTY COMPLAINT

Pru–Bache states on brief that "Cullather nowhere alleges that Blanton and Sugarman ever acted otherwise than as agents of Prudential–Bache, and Prudential–Bache does not contend that it can succeed on its claim against Cullather if he can prove his allegations against Blanton." At oral argument, counsel represented that Pru–Bache is bound by the actions of Blanton and Sugarman and does not contemplate shifting any possible liability to them. Accordingly, the third-party complaint will be dismissed in its entirety without prejudice to Cullather's right to reassert his third-party claims should Pru–Bache's representations prove inaccurate.

## II. COUNTERCLAIMS

### A. *Defenses as Affirmative Claims*

In its motion, Pru–Bache has pointed out that the relief Cullather demands in his counterclaim does not match the injury he alleges. Assuming that all of Cullather's allegations are true, he has parted with approximately $230,000.[3] Yet these same allegations, Pru–Bache acknowledges, would if proved establish a complete defense to its $2 million in claims. Pru–Bache contends that Cullather's counterclaims should be dismissed because they are merely defenses masquerading as affirmative causes of action.

■ Under the standards applicable to motions to dismiss, this Court cannot say that Cullather has failed to adequately state several of the causes of action advanced in his counterclaim. A motion under Fed.R.Civ.P. 12(b)(6) should not be granted for failure to seek the technically appropriate remedy when the availability of some relief is readily apparent on the face of the pleadings. *Doe v. United States Department of Justice,* 753 F.2d 1092 (D.C.Cir.1985); *Yakin v. University of Illinois,* 508 F.Supp. 848 (N.D.Ill.1981), *aff'd,* 760 F.2d 270 (7th Cir.1985). However,

the alleged value of Cullather's Paine Webber account.

some of Cullather's claims must be dismissed. The Court's task in what follows will be to examine all of Cullather's claims and defenses, weeding out what is meritless, thus setting Cullather's side of the case in order for further proceedings.

## B. *Rescission/Restitution*

■ Cullather's option account naturally fluctuated in value during the term of his customer relationship with Pru–Bache due to profits and losses. As part of the relief demanded in his counterclaim, Cullather asks that the unprofitable transactions be rescinded and the proceeds of the profitable transactions be restored to him. Cullather bases this on Section 29(b) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78cc(b)) and on principles of equity. Cullather has also moved (Br.Opp. 76) for leave to amend his complaint to add a rescission claim under Section 12(2) of the Securities Act of 1933 (15 U.S.C. Section 77*l*(2)). To support his approach to rescission in this case, Cullather relies heavily on *Merchant v. Oppenheimer & Co., Inc.*, 568 F.Supp. 639 (E.D.Va.1983), *aff'd in part sub nom. Dixon v. Oppenheimer & Co., Inc.*, 739 F.2d 165 (4th Cir.1984).

*Merchant* dealt solely with Section 13.1–522 of the Virginia Securities Act ("VSA"), which imposes civil liability on any person who "sells" a security in violation of certain other provisions of the VSA to a person "purchasing" that security. The pertinent issue in *Merchant* was whether a violator who wished to make amends under the 30–day settlement provision in Section 13.1–522 could net gains against losses where multiple transactions had occurred. The customer in *Merchant* demanded a refund of $85,324.63, which was computed by totalling the unprofitable transactions (without offsetting losses by profits), deducting income received, and adding statutory interest. The broker, by totalling *all* transactions, deducting income, and adding

interest, had arrived at a refund of only $39,942.23.

The trial court upheld the customer's calculation. A buyer of securities, the court held, may "recover damages for any sale of securities in violation of the statute, regardless of whether the buyer happened to profit from other sales of securities in violation of the statute." 568 F.Supp. at 644. The court took into account Section 13.1–522's broad remedial purpose, which encompasses fraud as well as unregistered dealing: "[i]t is difficult to characterize the remedy due a fraud victim as a 'windfall,' even if it exceeds total out-of-pocket loss."[4] *Id.* The burdensome consequences of this result for sellers is permissible, the court wrote, because "[t]he statute was intended to benefit buyers of securities, not sellers." *Id.*

*Merchant* cannot control this Court's decision under Section 29(b). Cullather's characterization of himself as a fraud victim does not entitle him to invoke *Merchant* unless he comes within the protection of Va.Code Section 13.1–522, which later discussion in this opinion will show he does not. Moreover, the *Merchant* court expressly based its holding on the intent of Section 13.1–522 and the damages remedy it supplies, not on federal securities law, and not on principles of equity. Cullather cannot obtain *Merchant*-type relief along any of the avenues open to him in the case at bar.

■ Cullather's motion to add a claim under Section 12(2) must be addressed before considering what relief is available to him under his rescission and restitution claims. The language and terms of Section 12(2) and Va.Code Section 13.1–522(d) are practically identical, therefore Section 12(2) would give Cullather a good argument by analogy for *Merchant*-type relief. But Section 12(2) does not apply to options contracts because an option writer is a seller, not a purchaser.[5] Furthermore, purchas-

---

**4.** A similar statement by the United States Supreme Court is discussed below at p. 607.

**5.** The *Merchant* court expressly premised its holding upon the plaintiff's membership in the

legislatively-protected group of securities "purchasers." 568 F.Supp. at 644.

ing securities in order to close outstanding options positions, as Cullather did, does not convert an options seller into a "purchaser" for Section 12(2) purposes. *Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 1194 (6th Cir.1981), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982); *Petralia v. Donaldson, Lufkin & Jenrette Securities Corp.*, [1981–82 Transfer Binder] Fed.Sec.L.Rep. (CCH) Paragraph 98,353 (N.D.Cal. Sep. 15, 1981). Cullather's argument that the covering purchase was integral to his options strategy makes a factual distinction from the cases just cited, but suggests no difference in result. Cullather must be regarded as a seller rather than a purchaser because his whole strategy depended on the opening option sold being greater than the closing option purchased; his only profit expectation was based on the selling premium's margin over the cost of satisfying the obligation that the opening option established. The simultaneous nature of his sales and purchases, for Section 12(2) purposes, does not materially distinguish Cullather from other options writers.

◼ Turning to Cullather's equitable rescission/restitution claim, the principles that determine the appropriate relief are straightforward and long-established. The object of rescission is to restore the parties to their status quo before the wrongful act. *See Chris–Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 391 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973) ("a prerequisite to the remedy of restitution is that a party seeking rescission must return any proceeds he has received from the transaction in order to be placed in status quo ante."). Restitution comes into play if rescission would lead to unjust enrichment. "In equity it has been traditional to hold a wrongdoer accountable for profits realized through the wrongful act." I.G. Palmer, *The Law*

*of Restitution* Section 2.12 at 158 (1978). Thus if rescission of Cullather's contract with Pru–Bache would leave the latter in possession of profits derived from Cullather's deposits under that contract, equity would demand that those profits be given to Cullather.

Cullather's selective restitution theory begs the question of whether he could establish that Pru–Bache enriched itself at all *during its contractual relationship* with him. The answer to this question is manifest on the pleadings: such profits as were realized in Cullather's account were reinvested, and the present result of the investment activity in the account is a loss. Pru–Bache has not been enriched in the least by the profitable transactions in the account, therefore Cullather has no claim on them.[6] The only conceivable benefits to Pru–Bache detectable in the record at bar are the funds Cullather transferred to Pru–Bache to open and maintain his account, which amounted to $141,000, and the assets Cullather transferred from his Paine–Webber account, which were worth $89,000. These sums will receive due consideration if Cullather establishes a right to rescission.

◼ Consideration of Cullather's statutory rescission claim leads to the same result. Section 29(b) is an adjunct to the other remedies provided by the Securities Exchange Act of 1934 and should be read in pari materia with them. *Occidental Life Insurance Co. v. Pat Ryan & Associates*, 496 F.2d 1255, 1266–67 (4th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed. 2d 297 (1974). As an adjunct rather than a remedy per se, Section 29(b) cannot logically be understood to provide a form of relief not otherwise available. Instead, Section 29(b) must be understood as barring Pru–Bache from maintaining its contract claim against Cullather if Cullather can establish that the contract is illegal,[7] and opening the way to making Cullather whole. *See Re-*

---

**6.** Cullather's speculative argument that he could have liquidated his account at an opportune moment and reaped a profit hardly establishes a cognizable interest. The term status quo *ante*, when used in the context of this case, means *before* the illegal bargain, not at some subsequent moment of Cullather's choosing.

**7.** In view of Cullather's factual allegations, the Court need not consider his argument concerning whether otherwise legal contracts that become illegal in their *performance* activate Section 29(b).

*gional Properties, Inc. v. Financial and Real Estate Consulting Co.*, 678 F.2d 552, 561–61 (5th Cir.1982); *see also Gunter v. Hutcheson*, 492 F.Supp. 546, 560 (N.D.Ga. 1980), *aff'd*, 674 F.2d 862 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed. 2d 63 (1982) (citing numerous cases on the Section 29(b) "voidability" principle). Cullather would be entitled to restitution in the amount that he can prove Pru–Bache to have been unjustly enriched.

■ Pru–Bache contends that Cullather's potential recovery is limited by Section 28(a) of the 1934 Act,[8] with which Pru–Bache argues Section 29(b) must be read in pari materia. But Section 28(a) does not impose an actual damages limit where Congress has provided for rescissionary relief. *Randall v. Loftsgaarden*, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986) (reviewing decision under Section 10(b)). On the other hand, the defrauded party is not to be unjustly enriched.

> "[W]here the defendant received more than the seller's actual loss ... damages are the amount of the defendant's profit." [*Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)]. This alternative standard aims at preventing the unjust enrichment of a fraudulent buyer, and it clearly does more than simply make the plaintiff whole for the economic loss proximately caused by the buyer's fraud. Indeed, the accepted rationale underlying this alternative is simply that "[i]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them."

*Id.*, 106 S.Ct. at 3153 (citations omitted). The Court finds this statement in the Section 12(2) context to be equally valid in the Section 29(b) context at bar. Moreover, the last-quoted language sheds light on the similar statement made in *Merchant;* in the case at bar, however, there are no profits that could be awarded to Cullather. Pru–Bache has not received more than Cullather's actual loss. Cullather's view of the available relief is rejected, and all rescissionary relief beyond Cullather's actual outlays will be struck.

■ Pru–Bache contends that Cullather's rescission and restitution claims must all be dismissed because Section 29(b) does not apply to lawful contracts, and because neither Section 29(b) nor equity permits the relief Cullather has demanded. The first contention assumes that the contract at issue is lawful, but Cullather has alleged procurement by fraud, in which case it is well settled that the contract would be illegal. *E.g., National Bank & Loan Co. v. Petrie*, 189 U.S. 423, 23 S.Ct. 512, 47 L.Ed. 879 (1903). It would be premature to dismiss Cullather's Section 29(b) claim without affording him the opportunity to prove the taint of fraud he alleges. It would be error to dismiss Cullather's rescission and restitution claims simply because he has asked for inappropriate relief. *Doe v. United States Department of Justice; Yakin v. University of Illinois.* And "rescission.... includes the defensive employment of the law of rescission in resisting a seller's action for breach of contract, as well as its use by the buyer offensively in an action for restitution." L. Loss, *Fundamentals of Securities Regulation* 1009 (1983). Pru–Bache's motion to dismiss must therefore be denied as to these claims, but so much of Cullather's relief demanded as is inappropriate as a matter of law will be struck from the counterclaim.

### C. *Counts III, V, VI, VIII and IX*

■ Cullather has also asserted federal securities fraud, common law fraud, breach of contract, conversion, and negligence in his counterclaim. These claims do not incorporate a rescissionary remedy, therefore the cash sums Cullather paid Pru–Bache pursuant to his brokerage agreement would not be recoverable; the Court would leave the parties as it found them. The only affirmative relief Cullather could obtain if he proved any or all of these claims

---

**8.** "[N]o person permitted to maintain a suit for damages under the provisions of this chapter shall recover ... a total amount in excess of his actual damages on account of the act complained of." 15 U.S.C. Section 78bb(a).

would be his actual damages, represented by his $89,000 out-of-pocket loss, plus punitive damages if proved under his common law fraud count.[9]  All other relief will be struck from Counts III, V, VI, VIII and IX.

### D.  *Virginia Securities Act*

■ Pru–Bache contends that, under the VSA, currency options are not "securities" and that Cullather has no standing as a securities "purchaser."

The Virginia Supreme Court teaches that the federal Securities Acts and the VSA have the same purpose and achieve this purpose in similar ways. *Pollok v. Commonwealth*, 217 Va. 411, 229 S.E.2d 858 (1976).  Relying on the strong similarities between the two legislative schemes, the Virginia Court held that the VSA's inclusive provisions should be read broadly and its exemptions narrowly. *Id.* at 413, 229 S.E.2d at 860.  The VSA's definition of a "security," although it does not explicitly include option contracts, is broad and open-ended.  Congress amended the federal acts in 1982 to include all commodity and currency options within the federal definition of a "security," but the Virginia General Assembly, though it has amended its definitional provisions since, has not done likewise.  Pru–Bache argues that this shows a more restrictive intent on the part of the Virginia legislature, but gives no reason for supposing this intent.  Recent Virginia judicial authority suggests the contrary in its broad construction of the term "security" under the VSA.  *See generally Fusion Energy Foundation, Inc.*, No. SEC870013 (Va. Corp. Comm'n Mar. 4, 1987) (holding that LaRouche fund-raising scheme satisfied both literal and economic reality analyses).  Pru–Bache's argument that currency options are not securities under the VSA will therefore be rejected.

■ However, Cullather is proceeding under Va.Code Section 13.1–522.  In the discussion of *Merchant v. Oppenheimer & Co., Inc.* above, it was stated that Cullather could not set up a right to *Merchant*-type relief on the coattails of Section 12(2) because Cullather, a *seller* of options, cannot be regarded as a Section 12(2) "purchaser." *Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.; Petralia v. Donaldson, Lufkin & Jenrette Securities Corp.*  This Court concludes that, in view of the similarity between Section 12(2) and Va.Code Section 13.1–522, Cullather lacks standing as a "purchaser" under the latter provision.  *See Merchant*, 568 F.Supp. at 644 ("[Section 13.1–522] was intended to benefit buyers of securities, not sellers.").  Accordingly, Cullather's Virginia Securities Act claim must be dismissed.

### E.  *RICO*

■ Cullather has counterclaimed for violations of RICO Sections 1962(b) (acquisition of an enterprise interest through a pattern of racketeering activity), 1962(c) (conduct of enterprise's affairs through a pattern of racketeering activity), and 1962(d) (conspiracy).  Pru–Bache has advanced numerous persuasive arguments concerning Cullather's RICO claims.  For the sake of brevity, only certain arguments will be addressed here.

Pru–Bache contends that it cannot be a RICO enterprise and a RICO defendant at the same time.  Cullather responds that, "[w]hile there is authority which supports this proposition, it has not been universally recognized by federal courts applying the RICO statute." (Br.Opp. 16; citation omitted).  The authority that supports Pru–

---

9.  Pru–Bache contends that Cullather's punitive damages claim for fraud as against Pru–Bache is contrary to law because punitive damages may be awarded against a principal for the act of its agent only where the principal participated in, authorized, or ratified the wrongful conduct on which liability is premised. *See Freeman v. Sproles*, 204 Va. 353, 131 S.E.2d 410 (1963); *Hogg v. Plant*, 145 Va. 175, 133 S.E. 759 (1926).  This contention implicitly decides a question of fact in Pru–Bache's favor, which this Court may not do in deciding the instant motion.  "[W]hen one acting as an agent ... is a permanent employee or officer of the company, the question of the authority and power of such a representative should be left to the jury, unless the evidence shows that this authority on the occasion in question was necessarily limited." *Bardach Iron & Steel Co. v. Charleston Port Terminals*, 143 Va. 656, 672, 129 S.E. 687, 692 (1925).

Bache's proposition is compelling. *United States v. Computer Sciences Corp.*, 689 F.2d 1181; 1190 (4th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed. 2d 953 (1983) (Section 1962(c)); *In re Action Industries Tender Offer*, 572 F.Supp. 846, 849 (E.D.Va.1983) (Section 1962(b)). There must also be a separate enterprise to support Cullather's conspiracy theory. *Gilbert v. Prudential–Bache Securities, Inc.*, 643 F.Supp. 107, 110 (E.D.Pa.1986).

As his separate enterprise, Cullather nominates the participants in Swiss Franc options trading on the Philadelphia Stock Exchange.[10] This approach is unacceptable because of the remoteness of the specified group from the transactions at issue. There must be some appreciable nexus between the enterprise and the alleged violation to support civil RICO liability. *See, e.g.*, H.R.Rep. No. 1549, 91st Cong., 2d Sess. 57, *reprinted in* [1970] U.S.Code Cong. & Ad.News 4007 ("interest" includes "all property and interests, as broadly described, *which are related to the violations*.") (emphasis supplied).

Section 1962(a), in terms, contemplates an investment in an enterprise. Nowhere does Cullather allege investment in an association in fact comprising Swiss Franc options trading on the Philadelphia Stock Exchange. Obviously, the only investment in this case was in Swiss Franc option contracts. Section 1962(b), in terms, contemplates an interest in the enterprise acquired or maintained through a pattern of racketeering activity. Nowhere does Cullather allege any interest in "the participants in Swiss Franc options trading on the Philadelphia Stock Exchange," nor can such an interest rationally be inferred from the record. Cullather has also failed to allege how any interest in the specified group was acquired "through a pattern of racketeering activity," which is also necessary under Section 1962(b). *E.g., Robinson v. City Colleges of Chicago*, 656 F.Supp. 555, 561 (N.D.Ill.1987). These gaps widen when it is considered that the Section 1962(b) interest must be substantial enough

to amount to a property right of some kind. *United States v. Jacobson*, 691 F.2d 110, 112–13 (2d Cir.1982).

Cullather's asserted enterprise suffers from a similar remoteness flaw under Section 1962(c), which contemplates conduct of or participation in enterprise affairs through a pattern of racketeering activity. Presumably Cullather sees Pru–Bache as a participating member of "the participants in Swiss Franc options trading on the Philadelphia Stock Exchange," but he alleges no pattern of racketeering activity touching options trading on an exchange. The racketeering activity Cullather alleges touches only his broker-customer relationship with Pru–Bache. Cullather has failed to show a separate enterprise under any of the four RICO subsections.

Assuming for present purposes that Cullather is not required to show a separate enterprise to state a claim under subsection (a), it nevertheless remains that he did not mention subsection (a) until oral argument on the motion to dismiss in this case. Since it was not included in the complaint, it is axiomatic that Cullather has failed to allege any of the elements required under subsection (a). Prejudice to Pru–Bache is also self-evident, since it did not even have the chance to confront this claim in the briefs supporting its motion. (Tr. 111–12). Finally, a claim under subsection (a) would have no more merit than under the remaining RICO subsections; Cullather is unable to allege an investment *by Pru–Bache* of the proceeds of racketeering activity in either of the two enterprises discussed above. Accordingly, Cullather's RICO claims will be dismissed.

## F. *"Counterclaim Preservation"*

In Cullather's "Counterclaim Preservation" count, he alleges that he "reasonably believes that there are other and further breaches, violations, losses, liabilities and causes of action which may be asserted against [Pru–Bache, Blanton, and Sugarman]." Cullather "reserves the right to rely upon any such breach, [etc.] revealed

---

**10.** Cullather also urges that Pru–Bache is a separate entity with respect to Blanton and Sugarman. The implications of this need not be considered so long as the third-party complaint is not exhumed.

by further investigation, discovery, research or proof at trial." (Paragraph 84). Cullather responds to Pru–Bache's motion to dismiss this count with a proposal that the Court treat this aspect as a motion for more definite statement, and give Cullather ten days after the close of discovery to add whatever additional claims he feels are called for.

Pru–Bache replies as follows.

Prudential–Bache, Blanton, and Sugarman should not be forced to wait to learn what claims Cullather is asserting until a few weeks before trial and after the cut-off dates for completion of discovery and filing of dispositive motions. The Federal Rules provide no procedure for a party simply to announce that it may someday wish to assert additional claims and thereby circumvent the express standards for filing amended complaints and counterclaims.

(Reply Br. 45–46). Cullather's counterclaim preservation claim flies in the face of the letter and spirit of the Federal Rules, which require a pleader to give his adversary fair notice. The claim will be dismissed.

### III. ORDER

For the reasons stated above, plaintiffs' and third-party defendants' motion is GRANTED IN PART, and it is hereby ORDERED that:

A. The third-party complaint is DISMISSED without prejudice;

B. All relief demanded in Counts I and II beyond a total of $230,000.00 is STRUCK;

C. All relief other than punitive damages demanded in Counts III, V, VI, VIII, and IX beyond a total of $89,000.00 is STRUCK;

D. Counts IV, VII, and X are DISMISSED with prejudice;

E. Defendant is DIRECTED to file and serve an amended counterclaim on or before August 14, 1987.