**POMPANO–WINDY CITY PARTNERS, LTD., East Wind Associates, LTD. and Steven J. Lawrence, Plaintiffs,**

v.

**BEAR STEARNS & CO., INC., Options Clearing Corp., Chicago Board Options Exchange, Inc., Jerry Canning, Richard Harriton and William Gangi, Defendants.**

Nos. 87 Civ. 7560 (PKL), 88 Civ. 7159 (PKL).

United States District Court, S.D. New York.

June 4, 1992.

Baker & Hostetler, Washington, D.C. (Mark A. Cymrot, Roger A. Colaizzi, Thomas O. Gorman, Steven H. Levin, James McNamara, Kathleen Milton, Pedro R. Pierluisi, Cole Corette & Abrutyn, Goodman, Phillips & Vineberg, of counsel), for plaintiffs.

Rosenman & Colin, New York City (Stephen L. Ratner, Emily A. Eiselman, Howard Wilson, of counsel), for defendant Bear Stearns & Co., Inc.

Schiff Hardin & Waite, Chicago, Ill. (Paul E. Dengel, L. William Munno, Jeanne L. Nowaczewski, Roger Pascal, Jay Williams, Seward & Kissel, of counsel), for defendants Chicago Bd. Options Exchange, Inc. and Options Clearing Corp.

## OPINION AND ORDER

LEISURE, District Judge.

This is an action arising under the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act") and principles of state common law. In broad strokes, the litigation focuses on the seizure and liquidation by Bear Stearns & Co., Inc. (hereinafter referred to as "Bear Stearns" or "defendant") of the accounts of the plaintiffs, Pompano–Windy City Partners, Ltd. ("Pompano"), East Wind Associates, Ltd. ("East Wind") and Stephen J. Lawrence ("Lawrence"), a principal of both of these entities, in the aftermath of the stock market crash of October 1987, when the Dow Jones Industrial Average lost over 500 points, eliminating vast sums of apparent wealth in the virtual blink of an eye. Options Clearing Corp. ("OCC"), which issues Standard and Poors Index options ("OEX options"), and Chicago Board Options Exchange, Inc. ("CBOE"), on which OEX options are traded, also are named as defendants.[1]

By Opinion and Order dated October 27, 1988 ("October 1988 Order"), reported at 698 F.Supp. 504, this Court ordered that the dispute between the plaintiffs and Bear Stearns be heard by an arbitration panel chosen under the auspices of the NASD. In March 1991, the Arbitrators reached a decision (the "Arbitration Award" or the "Award"), awarding $20,412,115 in damages to Bear Stearns, and the parties subsequently filed cross-motions to confirm and vacate the Award. Concurrently,

---

1. By Stipulations and Orders dated February 4, February 6, and May 28, 1991, plaintiffs' claims against American Stock Exchange, Inc., National Association of Securities Dealers, Inc. ("NASD"), New York Stock Exchange, Inc., Pacific Stock Exchange, Inc. and Philadelphia Stock Exchange, Inc. were dismissed with prejudice.

CBOE and OCC moved to dismiss the claims raised against them. After a motion to dismiss plaintiffs' Second Amended Complaint became fully submitted in November 1988, plaintiffs filed a Third Amended Complaint, dated December 9, 1988 ("Third Amended Complaint"). Defendants again moved to dismiss, and the motions became fully submitted on May 17, 1989. The Court postponed consideration of the merits of the motions to dismiss pending resolution of the arbitration proceedings, and received three supplemental briefs from the parties in the summer of 1991. The Court turns to consider the merits of the motions *seriatim*.

## I. *The Arbitration Award*

### A. Background

Pursuant to the October 1988 Order and a Stipulation and Order dated May 22, 1989, the dispute between the plaintiffs and Bear Stearns was submitted to a panel of five arbitrators chosen under the auspices of the NASD, two of whom were industry arbitrators and three of whom were public arbitrators not employed in the securities industry. *See* Arbitration Award, at 1, 9. During the arbitration, which involved 42 evidentiary hearing sessions over a period of some 21 months from April 13, 1989 to January 7, 1991, and produced a transcript of 4,876 pages, the arbitrators heard 23 witnesses, 17 of whom were called by Lawrence, and admitted 241 exhibits, 162 of which were offered into evidence by Lawrence. The Award was duly executed by the arbitrators, and was delivered to the parties on March 14, 1991.

The Arbitration Award sets forth the following facts and conclusions. At all times relevant to this action, Pompano and East Wind were limited partnerships that acted as market makers, with accounts clearing through Bear Stearns. Lawrence, an experienced and sophisticated trader, was a general partner of both Pompano and East Wind, and assumed liability for Pompano's obligations in a Partnership Account Agreement. Further, Lawrence had outstanding loans from Bear Stearns, total-ing $7,500,000, that were guaranteed by Pompano and East Wind. *See id.* at 1–4.

Going into the market crash of Friday, October 16 and Monday, October 19, 1987, Pompano had substantial exposure in OEX options and other securities. In fact, as the market fell, Pompano's exposure mushroomed, leaving its account at Bear Stearns $36,138,000 in deficit by the end of business on October 19. Despite this enormous deficit position, no money was deposited into the Pompano account, and, on the morning of October 20, Bear Stearns took control of the account, such that Pompano was not permitted to make any further trades. Moreover, Bear Stearns also seized the East Wind account on October 20, even though the market decline had not forced it into deficit. *Id.*

After the seizure of the Pompano and East Wind accounts, Bear Stearns made "a good faith effort to reduce the risk in the Pompano account," *id.*, including adding positions that ultimately resulted in further losses to Pompano exceeding $4 million. However, these losses were deducted from Bear Stearns' ultimate recovery by the arbitrators. *See id.* at 6. In addition, market action reduced the deficit in the Pompano account to $18,804,072 at the close of the market on October 22. Thereafter, the Pompano and East Wind accounts were transferred to an omnibus account at Bear Stearns in a private sale on the morning of October 23, for consolidation with other accounts that had experienced similar difficulties during the crash. Further, on October 26, Bear Stearns called its two loans to Lawrence, which represented a total debt of $7,883,017, and the proceeds from the liquidation of the East Wind account and from the sale of other collateral were applied to cover this debt. Totaling these figures, the arbitrators determined that Pompano, East Wind and Lawrence were liable to Bear Stearns for $15,801,895, plus $4,602,301 in interest, for a total liability of $20,412,115. *See id.* at 6–7. Pompano and Lawrence were found to be jointly and severally liable for the total amount of the Award, while East Wind was held to be liable for only $5,555,644 of this amount. *Id.*

## B. Scope of Review of Arbitration Award

■ "It is beyond cavil that the scope of [a] district court's review of an arbitration award is limited." *Sperry International Trade, Inc. v. Government of Israel*, 689 F.2d 301, 304 (2d Cir.1982); *accord Local 1199, Drug, Hospital and Health Care Employees Union v. Brooks Drug Co.*, 956 F.2d 22, 24 (2d Cir.1992) ("Our review of an arbitration award is quite limited."). The sole statutory bases for vacatur of an arbitration award are found in Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10. A motion to vacate an arbitration award also can be based on the judicially created defense of "manifest disregard of the law." *See Wilko v. Swan*, 346 U.S. 427, 436–37, 74 S.Ct. 182, 187, 98 L.Ed. 168 (1953); *Fahnestock & Co. v. Waltman*, 935 F.2d 512, 516 (2d Cir.1991), *cert. denied*, ——— U.S. ———, 112 S.Ct. 1241, 117 L.Ed.2d 474 (1992); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933–34 (2d Cir.1986).

"Judicial inquiry under the manifest disregard standard ... is extremely limited." *Fahnestock, supra*, 935 F.2d at 516. Manifest disregard "means more than error or misunderstanding with respect to the law. The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Bobker, supra*, 808 F.2d at 933 (citations omitted). "Illustrative of the degree of 'disregard' necessary to support vacatur under this standard is [the finding that] an 'arbitrator "understood and correctly stated the law but proceeded to ignore it." ' " *Fahnestock, supra*, 935 F.2d at 516 (quoting *Siegel v. Titan Industrial Corp.*, 779 F.2d 891, 893 (2d Cir.1985) (per curiam) (citation omitted)).

■ In the absence of one or more of these grounds for vacatur, a district court must confirm an arbitration award. 9 U.S.C. § 9; *Local 1199, supra*, 956 F.2d at 25; *Interpetrol Bermuda Ltd. v. Stinnes Interoil Inc.*, 1990 WL 250169, at *2, 1990 U.S.Dist. LEXIS 17376, at *5 (S.D.N.Y. Dec. 26, 1990) (Leisure, J.); *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche International, Ltd.*, 683 F.Supp. 945, 948 (S.D.N.Y.1988) (Leisure, J.), *aff'd*, 888 F.2d 260 (2d Cir.1989). Even the fact " ' "that a court is convinced [that the arbitrator] committed serious error does not suffice to overturn [the arbitrator's] decision." ' " *Local 1199, supra*, 956 F.2d at 25 (quoting *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987) (citation omitted)). Thus, when an arbitral award is challenged on one of the grounds enumerated above, a district court must be guided by the principle that "the arbitrator need only explicate his reasoning ... 'in terms that offer even a barely colorable justification for the outcome reached' in order to withstand judicial scrutiny." *In re Marine Pollution Service, Inc.*, 857 F.2d 91, 95 (2d Cir.1988) (quoting *Andros Compania Maritima S.A. v. Marc Rich & Co. A.G.*, 579 F.2d 691, 704 (2d Cir.1978)). In fact, the Supreme Court decision in *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), "stands for the proposition that an arbitrator is not required to explain the rationale for his award, and that any ambiguity in the award must be resolved, if possible, in a manner supporting confirmation of the award." *Carte Blanche, supra*, 683 F.Supp. at 951. It is with these principles in mind that the Court now turns to consider the cross-motions to confirm and vacate the Arbitration Award.

## C. Bases of Motion to Vacate Arbitration Award

Plaintiffs have asserted six bases for their argument that the Arbitration Award must be vacated. First, plaintiffs argue that the arbitrators manifestly disregarded the law of private sales, and that no private sale of securities from Pompano to Bear Stearns ever occurred. Second, plaintiffs assert that the law of margin calls was ignored in the Arbitration Award, and that, without a margin call, Bear Stearns had no right to seize and liquidate Pompano's account. Third, it is claimed that the arbitrators had no basis for an award against East Wind, because its account was not in

deficit. Fourth, plaintiffs contend that the panel refused to hear relevant evidence. Fifth, plaintiffs claim that the arbitrators displayed evident partiality.

■ Before proceeding to address these claims, however, the Court pauses briefly to reject plaintiffs' sixth contention, that arbitration of this case was improper because there was no agreement to submit the securities law claims to arbitration. *See* Plaintiffs' Memorandum in Support of Their Motion to Vacate the NASD Arbitration Award and in Opposition to Bear Stearns' Motion for Entry of a Judgment ("Motion to Vacate"), at 64–67. This argument was squarely addressed and rejected by this Court in the December 26 Order. This ruling is the law of the case, and will not be revisited at this late date. *See Liona Corp. v. PCH Associates (In re PCH Associates)*, 949 F.2d 585, 592 (2d Cir.1991). Moreover, the Court already has denied plaintiffs' motion for reargument of the December 26 Order. *See* Memorandum Order, dated February 2, 1989. The Court therefore rejects, without further discussion, all arguments in the instant motion concerning the alleged impropriety of the arbitration of this dispute.

### 1. *The Private Sale*

■ Plaintiffs' first set of arguments in opposition to confirmation of the Arbitration Award focuses on the claim that a private sale of Pompano's position to Bear Stearns on October 23 never occurred. *See* Motion to Vacate, at 22–43; Plaintiffs' Reply Memorandum in Support of their Motion to Vacate the NASD Arbitration Award and in Opposition to Bear Stearns's Motion for an Entry of a Judgment ("Supplemental Motion to Vacate"), at 2–16. According to plaintiffs, "beneficial ownership of the options was never transferred, and Pompano should have been credited with the more than $16 million which Bear Stearns realized in liquidating Pompano's position in the marketplace." Supplemental Motion to Vacate, at 15. In fact, the

plaintiffs contend that "[t]he panel's ruling on this issue was the difference between Bear Stearns owing Pompano money and Pompano owing Bear Stearns money." Motion to Vacate, at 22.

The arguments on this issue are premised on a number of distinct legal theories. First, plaintiffs contend that the alleged "trades" of the OEX options violated CBOE Rule 6.49, which addresses the mechanisms for conducting transactions off the exchange. Second, it is argued that both CBOE and OCC found that the "trades" never occurred, and that there was no legal basis for a finding that a lawful private sale occurred. Finally, the plaintiffs ascribe various insidious motives to Bear Stearns, contending that the transfer of the OEX options from the Pompano account to the omnibus account was done illegally for the purpose of appropriating the inherent profit associated with these securities. *See* Motion to Vacate, at 24–25.[2]

In response, Bear Stearns asserts that, in light of the severe displacement caused by the market crash, CBOE specifically exempted Bear Stearns from the requirements of Rule 6.49, and that neither CBOE nor OCC have ever stated that a sale did not occur. *See* Memorandum of Law of Defendant Bear, Stearns & Co. in Further Support of Defendant's Motion to Confirm Arbitration Award and in Opposition to Plaintiffs' Motion to Vacate Arbitration Award ("Supplemental Motion to Confirm"), at 27–37. In addition, Bear Stearns rejects the contention that the transaction was prompted by improper motives. According to defendant, Pompano's account was $36 million in deficit on the morning of October 20, with an exposure exceeding $80 million. *Id.* at 7. In fact, defendant argues that its actions were an appropriate response to plaintiffs' failure to cover the exposure in their accounts and to the risk of vast losses to Bear Stearns if the market

---

**2.** Plaintiffs also assert that the arbitrators were biased and precluded them from introducing evidence that would have demonstrated that a private sale never occurred. *See* Motion to Vacate, at 30–33. These claims are discussed more fully below.

dropped further. *Id.* at 37–42.[3]

CBOE Rule 6.49 provides that

(a) Except as otherwise provided by this Rule, no member acting as principal or agent may effect transactions in any class of option contracts listed on the Exchange for a premium in excess of $1.00 other than (i) on the Exchange, (ii) on another exchange on which such option contracts are listed and traded, or (iii) in the over-the-counter market ... unless the member has attempted to execute the transaction on the floor of the Exchange and has reasonably ascertained that it may be executed at a better price off the floor.

(b) Notwithstanding the provisions of paragraph (a) of this Rule, a member acting as agent may execute a customer's order off the Exchange floor with any other person (except when such member also is acting as agent for such other person in such transaction) for the purchase or sale of an option contract listed on the Exchange.

*See* Appendix E to Motion to Vacate, tab 13 (CBOE Constitution and Rules). In the face of Rule 6.49. defendants have produced a letter from CBOE to Bear Stearns, dated October 22, 1987 ("October 22 Letter"), which exempts Bear Stearns from the requirements of the Rule. In relevant part, the letter provides that

the Exchange will take no action against Bear Stearns or the transferring market-makers for these transfers under Exchange Rules 6.49 and 4.6 prohibiting transactions off the Exchange and adjustments, respectively. The ... no-action position stated in this letter [has] been provided because of the emergency

conditions prevailing on the date hereof, and apply only to the above described transfers occurring between the date hereof and the opening of business on Monday, October 26, 1987.

*See* Appendix B to Supplemental Motion to Confirm, tab 19 (October 22 Letter).

Plaintiffs argue at length that the October 22 Letter does not constitute an exemption from Rule 6.49 for the purposes of effecting a private sale from Pompano to Bear Stearns, and does not waive the price protections provided by Rule 6.49. Rather, claim plaintiffs, the October 22 Letter only authorized Bear Stearns to make mechanical adjustments and transfers between accounts. *See* Motion to Vacate, at 38–42; Supplemental Motion to Vacate, at 10–14. However, the textual context of the October 22 Letter and the testimony cited by the parties both support the contrary position, that a proper private sale occurred, and at best are subject to contrary inferences. Similarly, other evidence presented to the arbitrators also supports the conclusion that Bear Stearns acted properly and conducted a legitimate private sale, and at most can be said to support contrary inferences.[4]

All of the evidence discussed above was submitted to and considered by the arbitrators, who made reasonable inferences based on the evidence before them. Moreover, on this motion, the role of the Court is not to substitute its view of the October 22 Letter and the inferences to be drawn from testimony and exhibits, but rather to accept the arbitrators' inferences when reasonable under the circumstances and to determine whether the result is in manifest

---

**3.** Bear Stearns also contends that the private sale was authorized by the OCC/CBOE Joint Account Agreements for Market Makers, Specialists and Registered Traders ("the Market Makers Agreement") between the plaintiffs and Bear Stearns. *See* Appendix B to Supplemental Motion to Confirm, tab 6. As discussed, *infra*, defendant's actions were justifiable under the terms of the Market Makers Agreement. *See, e.g., Prudential–Bache Securities, Inc. v. Stricklin,* 890 F.2d 704, 706–707 (4th Cir.1989) (Powell, J., sitting by designation). However, citation of the Agreement at this juncture begs the question: plaintiffs are contending that no pri-

vate sale occurred, and defendant's claim that the Agreement authorizes private sales is not responsive to this concern.

**4.** In fact, plaintiffs' claim that Bear Stearns' actions were fueled by the improper motive of misappropriating the inherent profit in Pompano's options is counterbalanced by Bear Stearns' claim that Lawrence liquidated $8 million in assets immediately after the crash and sent the funds offshore, to the Netherland Antilles, beyond the jurisdiction of this Court. *See* Supplemental Motion to Confirm, at 12–14.

disregard of controlling legal principles. *See Local 1199, supra*, 956 F.2d at 25; *Fahnestock, supra*, 935 F.2d at 516. Because plaintiffs' arguments with respect to the consummation of a private sale fail to demonstrate that the arbitrators manifestly disregarded applicable principles of controlling law, the motion to vacate the Arbitration Award on this basis must be denied.

### 2. *The Law of Margin Calls*

Plaintiffs' second argument focuses on the law of margin calls. According to the plaintiffs, the arbitrators manifestly disregarded the legal requirement that Bear Stearns make a margin call before seizing and liquidating Pompano's accounts. Moreover, plaintiffs contend that the absence of an explicit finding in the Arbitration Award that a margin call was made must be construed as a finding that no such call occurred. *See* Motion to Vacate, at 43–49; Supplemental Motion to Vacate, at 16–24. In response, Bear Stearns asserts that the Market Makers Agreement eliminated the need for a margin call as a condition precedent to the seizure of Pompano's account in the event that the account went into deficit. Further, defendant strenuously asserts that a margin call of $5 million was made on October 19, but that no funds were provided in response to this demand. Supplemental Motion to Confirm, at 42–49.

■ Before scrutinizing the litigants' substantive arguments on this matter, the Court begins by rejecting plaintiffs' assertion that the absence of an explicit finding by the arbitrators that a margin call was made must be strictly construed, and serve as the basis for vacatur of the Arbitration Award. As the Court explained above, an arbitrator need do no more than present "a barely colorable justification for the outcome reached." *Andros Compania Maritima, supra*, 579 F.2d at 704. In addition, an arbitrator need not explain the rationale underlying an award, and all ambiguities must be resolved in favor of confirmation of the award. *Carte Blanche, supra*, 683 F.Supp. at 951. Thus, plaintiffs' assertion that the arbitrators "would have found a

margin call if [they] could have stomached such a finding," Supplemental Motion to Vacate, at 23, and their contention that the Award must be vacated because the arbitrators did not explicitly state that a margin call was made, are rejected.

■ Plaintiffs' margin call arguments begin by referring to 17 C.F.R. § 240.15c3–(a)(6)(iv), which provides that a broker or dealer carrying a market maker's account

(A) Shall mark the account to the market not less than daily and shall issue appropriate margin calls for additional equity which shall be met by noon of the following business day;

. . . . .

(C) Shall not extend further credit in the account if the equity in the account falls below the prescribed [level];

(D) Shall take steps to liquidate promptly existing positions in the account in the event of a failure to meet a call for equity.

According to the plaintiffs, this Rule imposes a mandatory, nonwaivable obligation on the broker both to issue a margin call and to give the market maker sufficient time to meet the call before seizure and liquidation of an account. *See* Motion to Vacate, at 43, 45–46; Supplemental Motion to Vacate, at 16–18.

■ However, plaintiffs' arguments must fail. The purpose of margin call rules is to protect brokers from the risks associated with insufficiently secured accounts, and to prevent customers from carrying vast exposure in their accounts without adequate capital to cover their positions. *See, e.g., Sherman v. Sokoloff,* 570 F.Supp. 1266, 1270 n. 14 (S.D.N.Y.1983) ("the central purpose of margin calls [is] to protect the broker, not to give notice to customers"). Moreover, it is clear that margin call notice requirements can be varied by contract. *See Cauble v. Mabon Nugent & Co.,* 594 F.Supp. 985, 991 (S.D.N.Y.1984) ("Margin call notice requirements may be altered or waived by contract ... and this is done typically in customer agreements which authorize the broker to liquidate any customer property in

its possession to satisfy account deficiencies whenever an account becomes undermargined."); *see also Modern Settings, Inc. v. Prudential–Bache Securities, Inc.,* 936 F.2d 640, 645 (2d Cir.1991) (discussing "contractual right to liquidate margin accounts without notice")..

In fact, under the terms of the Market Makers Agreement,

> Whenever either Clearing Member or the Clearing Corporation considers it necessary for its protection, or in the event of the death or insolvency of any Member ... or in the event any Member shall default in any obligation to Clearing Member or Clearing Corporation, Clearing Member and the Clearing Corporation are hereby severally authorized by Members to sell out or buy in any position or other asset in the Account, to cancel any open, uncleared transaction, to exercise any option, and to close out the Account in whole or in part.... Any exercise, sale, buy in, liquidation, or cancellation made under this Agreement, or the Account or any position or other asset therein may be made by Clearing Corporation (or by Clearing Member, as the case may be) according to its judgment and discretion, at public or private sale and without notice to Members.

Market Makers Agreement ¶¶ 4–5. Thus, plaintiffs agreed to allow Bear Stearns, in its discretion, to act without notice to protect itself if Pompano's account went into deficit. Further, given that Lawrence was a sophisticated, experienced market-maker, this Court has no hesitation in holding him to the bargain that was struck. *See Modern Settings, supra,* 936 F.2d at 644 ("[l]iquidation provisions in securities broker-customer contracts have been upheld by courts where sufficient equality of bargaining power exists, as between a sophisticated, experienced investor and a broker").

Before proceeding, the Court turns to discuss *Prudential–Bache Securities, Inc. v. Stricklin,* 890 F.2d 704, 707 (4th Cir. 1989), which involved a similar situation to the case at bar. As a result of the October 1987 market crash, Stricklin's account at Prudential–Bache had a deficit exceeding $100,000. Stricklin was given one hour to meet a margin call, and his account was seized and liquidated when he failed to produce adequate capital to meet his debt. Using language that is particularly apt with respect to the instant action, Justice Powell, sitting by designation on the Fourth Circuit, rejected Stricklin's claim that the broker had improperly seized his account.

> A brokerage house should not have to risk a nearly unlimited amount of its own funds while waiting ... to see if a client can meet a margin call.... [Stricklin's] argument is essentially that, if [the broker] had "loaned" him more money by allowing him to trade without investing any more of his own funds, he could have ... eliminated his debt.... This sounds suspiciously like the gambler who is $100,000.00 in debt to the casino arguing that he should not be liable for the debt because if it had just let him borrow another $50,000.00 he would have won the very next hand of poker. As a matter of law, once [Stricklin] was in debt to [the broker, it] had no duty, contractual or otherwise, to lend [him] more money.

*Id.*

■ Moreover, assuming, *arguendo,* that a margin call was necessary in this case, the arbitrators had sufficient evidence before them to determine that a call was made. *See, e.g.,* Appendix B to Supplemental Motion to Confirm, tab 13, at 1–20 (transcript of conversations concerning Lawrence ability to cover margin call and account deficits); *id.,* tab 14 (letter from Bear Stearns to Lawrence, dated October 22, 1987) ("Unless you meet your margin requirements by deposit of sufficient marketable collateral and/or cash by 9:30 a.m. ... on 10/23/87, Bear Stearns shall take all actions which it deems appropriate to reduce market risk").

The role of the Court on this motion is not to substitute its judgment for the judgment of the arbitrators, but rather to accept the arbitrators' reasonable inferences and to determine whether the Award was in manifest disregard of controlling legal principles. In light of the discussion above,

it is clear that plaintiffs have not shown that the arbitrators manifestly disregarded the law of margin calls, and the motion to vacate the Arbitration Award on this basis must be denied.

### 3. *Award Against East Wind*

 Plaintiffs' next challenge to the Arbitration Award asserts that there was no basis for an award against East Wind. However, this claim is easily overcome. Under the Guaranty Agreement signed by Lawrence as general partner of East Wind,

> Upon the failure of the Obligor to pay Obligations as and when required or the failure of either Guarantor to comply with the terms and conditions of [this agreement], the Guaranteed Party shall have, in addition to any other rights it may have under applicable law, the right, without prior notice or demand, to sell or otherwise dispose of any Collateral at a public or private sale in any manner and upon such terms as it deems appropriate . . .

Appendix B to Supplemental Motion to Confirm, tab 10 (Guaranty Agreement between Bear Stearns, Pompano and East Wind, dated December 12, 1986). At the time of the seizure of the East Wind account, Pompano's account was over $36 million in debt. Further, Lawrence, who had agreed to serve as a guarantor of Pompano's obligations, had $7.5 million in outstanding loans from Bear Stearns that were guaranteed by East Wind and Pompano. Faced with this tangled web of finances and guarantees, the arbitrators determined that the seizure and subsequent liquidation of the East Wind account was proper, and the Court can discern no basis for vacating this conclusion.

### 4. *Refusal to Hear Evidence and Partiality of the Panel*

 The next basis for plaintiffs' motion to vacate the Arbitration Award is their claim that the arbitrators improperly excluded the testimony of one of their star expert witnesses, Leon Pomerance ("Pomerance"). According to the plaintiffs, when presented with Pomerance's testimony, "[t]he Panel refused to listen. As it be-

came clear that Mr. Pomerance would refute key points in Bear Stearns' case, the Panel reacted with hostility and then very quickly dismissed him from the room, refusing to hear his testimony on any subject and in any form." Motion to Vacate, at 51. Thus, relying on 9 U.S.C. § 10(c), which provides that a district court may vacate an arbitration award "[w]here the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy," plaintiffs move the Court to vacate the Award.

An arbitrator's refusal to hear evidence does not automatically mandate the vacatur of an award. It is well settled that "[t]he arbitrator is the judge of the admissibility and relevancy of evidence submitted in an arbitration proceeding." *Hoteles Condado Beach, La Concha and Convention Center v. Union de Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir.1985); *accord Grinnell Housing Development Fund Corp. v. Local 32B–32J, Service Employees International Union*, 767 F.Supp. 63, 67 (S.D.N.Y.1991). Moreover, "[i]n handling evidence, an arbitrator need not follow all the niceties observed by the federal courts. He need only grant the parties a fundamentally fair hearing." *Bell Aerospace Company Division of Textron, Inc. v. Local 516, International Union, UAW*, 500 F.2d 921, 923 (2d Cir.1974); *accord Fine v. Bear Stearns & Co.*, 765 F.Supp. 824, 829 (S.D.N.Y.1991) ("petitioners' claim that the hearing was unfair amounts to no more than a disagreement with the arbitrators [sic] rulings on the weight and relevancy of evidence"). Thus, "[o]nly the most egregious error which resulted in adversely affecting the rights of a party would justify . . . and require vacatur of an award." *Hunt v. Mobil Oil Corp.*, 654 F.Supp. 1487, 1512 (S.D.N.Y.1987).

Despite plaintiffs' claims that they were precluded from presenting their case and severely prejudiced by the improper exclusion of Pomerance's testimony, it is clear that they have not made a showing of impropriety sufficient to mandate vacatur of the Award. The court begins by noting that, contrary to plaintiffs' assertions,

**1278**

Pomerance was allowed to present the arbitrators with testimony on a wide range of topics. *See* Arbitration Transcript, at 3985–4056 (testimony of Leon Pomerance). Moreover, Pomerance was one of seventeen witnesses called by the plaintiffs, three of whom were experts. Given that the plaintiffs had the opportunity to present virtually all of their evidence to the arbitrators, and that there is a wealth of evidence in the record to support the Award, the Court believes that even an improper exclusion of this testimony would not have constituted denial of "a fundamentally fair hearing" sufficient to justify vacatur of the Award.

⬛ Moreover, the plaintiffs have not demonstrated that the limits placed on Pomerance's testimony were improper. First, it appears that Pomerance did not review the whole record and all of the exhibits that were before the arbitrators prior to his testimony. *See* Arbitration Transcript, at 3991–4010. Thus, exclusion of certain aspects of Pomerance's testimony was proper under Fed.R.Evid. 602, 702 and 703. Second, most of the other questions that Pomerance was prohibited from answering concerned legal conclusions on the ultimate issues to be decided in the arbitration. *See, e.g.,* Arbitration Transcript, at 4031 (statement of Chairman Dolan) ("you're asking him to draw conclusions from the testimony here"). The language of Fed.R.Evid. 704(a) provides that evidence "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." However, the Second Circuit recently noted that Rule 704 "has not 'lower[ed] the bars so as to admit all opinions.'" *Hygh v. Jacobs,* 961 F.2d 359, 363 (2d Cir.1992) (quoting Fed.R.Evid. 704 advisory committee's note). Thus, the Second Circuit "is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion." *Id.* Accordingly, because the arbitrators properly excluded Pomerance's testimony, and because any improper exclusion of testimony did not infringe upon plaintiffs' right to a full and fair hearing, the motion to vacate the Arbitration Award on this basis is denied.

### 5. *Partiality of Arbitrators*

⬛ Finally, the Court turns to consider plaintiffs' claim that the Arbitration Award must be vacated because the arbitrators displayed evident partiality. Under 9 U.S.C. § 10(b), the Court may vacate an arbitration award "[w]here there was evident partiality or corruption in the arbitrators." As explained by the Second Circuit,

> "[E]vident partiality" involves more than just the "appearance of bias." We do not, however, require proof of actual bias. Instead, we have held that "evident partiality" exists "where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration."

*Local 814, International Brotherhood of Teamsters v. J & B Systems Installers & Moving, Inc.,* 878 F.2d 38, 40 (2d Cir.1989) (per curiam) (quoting *Morelite Construction Corp. v. New York City District Council Carpenters Benefit Funds,* 748 F.2d 79, 84 (2d Cir.1984)); *accord Thomas C. Baer, Inc. v. Architectural and Ornamental Iron Workers Local Union No. 580,* 813 F.2d 562 (2d Cir.1987) (finding "absolutely no evidence that the arbitrator acted out of improper motives or was predisposed to favor either party").

⬛ In reviewing claims of arbitral bias, courts consider various factors, including the arbitrator's financial interest in the outcome, the nature of the relationship between the arbitrator and the allegedly favored party and whether the relationship existed during the arbitration. *See Sun Refining & Marketing Co. v. Statheros Shipping Corp.,* 761 F.Supp. 293, 299 (S.D.N.Y.), *aff'd,* 948 F.2d 1277 (2d Cir. 1991). A business or family relationship between an arbitrator and a party to an arbitration may lead to vacatur of an award. *See Morelite, supra,* 748 F.2d at 81–82 & n. 1 (family); *Sun, supra,* 761 F.Supp. at 301 (business). However, the existence of a professional relationship between the arbitrator and one of the parties to the proceeding, conclusory allegations of bias, and dissatisfaction with the result of the arbitration are not sufficient bases for

vacating an award. *See Bell Aerospace, supra,* 500 F.2d at 923 ("that the arbitrator consistently relied on evidence and reached conclusions favorable to [one party].... does not establish 'evident partiality' "); *Sun Refining, supra,* 761 F.Supp. at 301 (professional relationship not basis for vacating award); *Fine, supra,* 765 F.Supp. at 829 n. 8 (rejecting "claim that the arbitrators were biased because they were professionals in the securities industry ... as bereft of factual support"); *Hotel, Motel & Restaurant Employees and Bartenders Union v. P. & J.G. Enterprises, Inc.,* 731 F.Supp. 88, 92 (N.D.N.Y.1990) (rejecting conclusory allegations of arbitral bias).

Based on the finding, *supra,* that the Arbitration Award is supported by substantial evidence and that the panel did not improperly exclude exhibits or testimony, the Court begins by rejecting plaintiffs' contention that the arbitrators were biased because they engaged in a pattern of improper rulings. Next, the Court rejects plaintiffs' claim that the arbitrators improperly forced them to use the Third Amended Complaint as the answer and counterclaim in the arbitration proceeding. In fact, the arbitrators gave the plaintiffs the option of submitting a separate answer, and the claim that plaintiffs were only given 24 hours to make a decision on this issue is flatly contradicted by the record. *See* Arbitration Transcript, at 45–47 (granting plaintiffs from Thursday until Tuesday to determine whether to rely on claims in Third Amended Complaint during arbitration proceeding).

Finally, the Court also rejects plaintiffs' conclusory allegations of bias stemming from the selection of the arbitrators under the auspices of the NASD. To demonstrate that the NASD was a biased arbitral forum, plaintiffs focus on the purported prejudice of Richard Ryder, a past director of NASD arbitration who was proposed as an arbitrator in this action. *See* Motion to Vacate, at 62. However, Ryder was challenged by the plaintiffs, and did not serve

as a member of the arbitration panel in this case. *See* Supplemental Motion to Confirm, at 63. Moreover, plaintiffs have not provided any evidence to demonstrate that the five arbitrators who were chosen to preside at the arbitration proceedings in the instant case were biased. For example, there have been no allegations of business or family relationships between the arbitrators and any of the parties to the arbitration.

 After a thorough investigation, *see* December 26 Order, at 28–35, this Court rejected the proposition that the mere fact that the arbitration was being conducted under NASD auspices was sufficient to demonstrate arbitral bias. Moreover, the plaintiffs have provided no probative evidence in support of the proposition that the arbitrators and the arbitration forum were biased. Thus, the Court is unable to conclude that a reasonable person would determine that the arbitrators were partial to one party in this action, and the motion to vacate the Arbitration Award on this basis is denied.

### D. The Arbitration Award is Confirmed

In light of the foregoing discussion, it is clear that the plaintiffs have failed to present any basis for a vacatur of the Arbitration Award. First, there has been no showing that the Arbitrators manifestly disregarded the law of private sales or margin calls, or that there was no basis for an award against East Wind. Further, plaintiffs have not demonstrated that the panel improperly excluded evidence. Finally, there has been no showing of arbitral bias. Accordingly, the motion to confirm the Award is granted, and the motion to vacate the Award is denied.

### II. *CBOE and OCC Motions to Dismiss*

The Court next turns to consider the motions of OCC and CBOE to dismiss the Third Amended Complaint under Fed. R.Civ.P. 9(b) and 12(b)(6).[5]

---

**5.** In the face of the motions to dismiss plaintiffs' second and third causes of action, which allege violations of Section 17(a) of the Securities Act

and Section 15(c)(1) of the Exchange Act, plaintiffs concede that Courts in the Second Circuit have held that there is no private right of action

A. Standards for Motions under Rules 9(b) and 12(b)(6)

Fed.R.Civ.P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b) serves three purposes: ensuring that defendants receive fair notice of plaintiffs' claims; protecting defendants' reputations from unfounded allegations of improper conduct; and preventing institution of strike suits. *See O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991); *Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir.1990); *DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). Allegations of fraud must be specific enough to give the defendants "a reasonable opportunity to answer the complaint" and must give "adequate information" to allow the defendants to frame a response. *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557–58 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

 For the purposes of a Rule 9(b) motion, the Court must "read the complaint generously, and draw all inferences in favor of the pleader." *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). However, even though Fed.R.Civ.P. 8(a) "requires only a 'short and plain statement' of the claims for relief," Rule 9(b) requires that "the time, place, speaker, and sometimes even the content of the alleged misrepresentation" must be alleged specifically. *Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990) (quoting *DiVittorio, supra,* 822 F.2d at 1247); *accord Ross, supra,* 904 F.2d at 823. While Rule 9(b) provides that scienter can be pleaded "generally," there must be "some factual basis for conclusory allegations of intent. Allegations of scienter are [only] sufficient if supported by facts giving rise to a 'strong inference' of

fraudulent intent." *Ouaknine, supra,* 897 F.2d at 79–80 (citations omitted); *accord Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 143–44 (2d Cir.1991); *see also Kramer v. Time Warner, Inc.,* 937 F.2d 767, 776 (2d Cir.1991) (finding inference of scienter from drop in market price to be "sheer speculation"); *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172–73 (2d Cir.1990) (rejecting chain of inferences where initial claim concerning leaking of confidential information was insupportable).

The Court will also be scrutinizing plaintiffs' claims under Fed.R.Civ.P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Festa v. Local 3 International Brotherhood of Electrical Workers,* 905 F.2d 35, 37 (2d Cir.1990); *see also Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984) ("The function of a motion to dismiss 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980))).

 Thus, a motion to dismiss must be denied "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)); *see also Morales v. New York State Department of Corrections,* 842 F.2d 27, 30 (2d Cir.1988). In deciding a motion to dismiss, the Court must limit its analysis to the four corners of the complaint, *see Kopec v. Coughlin,* 922 F.2d 152, 154–55 (2d Cir.1991), and must accept plaintiffs' allegations of fact

under these statutory provisions. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motions to Dismiss the Third Amended Complaint ("Plaintiffs' Response"), at 6 n. 3; *see also Finkel v. Stratton Corp.,* 962 F.2d 169, 174–76 (2d Cir. 1992) (finding no private right of action under

Section 17(a)); *Dubin v. E.F. Hutton Group, Inc.,* 695 F.Supp. 138, 147 (S.D.N.Y.1988) (Leisure, J.) (finding no private right of action under Section 15(c)(1)). Accordingly, the second and third causes of action are dismissed without further discussion.

as true, together with such reasonable inferences as may be drawn in its favor. *Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986); *Murray v. Milford*, 380 F.2d 468, 470 (2d Cir.1967); *Hill v. Sullivan*, 125 F.R.D. 86, 90 (S.D.N.Y.1989). However, on a motion to dismiss, the Court may also consider documents that are incorporated into the complaint by reference and materials that can be judicially noticed. *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Kramer, supra*, 937 F.2d at 773–74.

## B. Merits of Plaintiffs' Claims

### 1. *Section 10(b)*

Plaintiffs' first cause of action alleges a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.-10b–5. Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance," while Rule 10b–5 prohibits "employ[ing] any device, scheme or artifice to defraud [and] engag[ing] in any act ... which operates ... as a fraud or deceit upon any person, in connection with the purchase or sale of any security." To prevail on an action under Section 10(b), plaintiffs must prove "that in connection with [their] purchase or sale of a security, defendants, with scienter, employed a device, scheme or artifice to defraud or engaged in a fraudulent act, practice or course of business, and that [plaintiffs were] damaged thereby." *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 598 (2d Cir.1991). In addition, plaintiffs must prove both loss causation, or direct, proximate cause, and transaction causation, or reliance. *Wilson v. Ruffa & Hanover, P.C.*, 844 F.2d 81, 85–86 (2d Cir. 1988), *aff'd on other grounds on reconsideration*, 872 F.2d 1124 (2d Cir.1989).

The Section 10(b) claims against CBOE and OCC relate to two allegedly fraudulent activities. First, plaintiffs claim that defendants created an options trading market, and that plaintiffs relied on the integrity of that market, as represented in the Options Disclosure Document ("ODD") in executing their securities transactions. However, plaintiffs claim that the ODD was false and misleading, and that defendants failed adequately to disclose the risks of option trading, to disclose the option trading process and to regulate the options markets in accordance with applicable rules. *See* Third Amended Complaint ¶¶ 94–100. Second, plaintiffs contend that CBOE and OCC knowingly mispriced options and failed to comply with applicable rules governing the pricing of options during the week of October 19. According to plaintiffs, they were damaged by the mispricing scheme because it led Bear Stearns to issue a margin call that was far in excess of the equity needed to provide adequate security for the deficit in their accounts. *See* Third Amended Complaint ¶¶ 101–113; Plaintiffs' Response at 94 ("unreasonably high margin requirements ... were a substantial contributing cause of Bear Stearns' seizure and purported liquidation of plaintiffs' accounts and, thus, plaintiffs' losses").

The Court first turns to examine the claims arising out of the alleged omissions and falsehoods in the ODD. Plaintiffs allege that,

among other things, the ODD failed to adequately disclose the risks of option trading, the ODD failed to adequately disclose the option trading process,.... options were not priced in accordance with the rules, trading was not conducted in accordance with the rules, opening rotations were not conducted in accordance with the rules, prices were not always available with each series in accordance with the rules, trading halts were not conducted in accordance with the rules, a fair and orderly market was not maintained in accordance with the rules, and plaintiffs [sic] accounts were not maintained in accordance with the rules and pertinent contractual obligations and undertakings.

Third Amended Complaint ¶¶ 99–100. First, these allegations fail the test of Rule 9(b). Plaintiffs have not stated what Rules were violated by the defendants, how defendants' acts were false and misleading, when the rules violations occurred and the manner in which defendants' actions violated the rules. Rather, plaintiffs repeatedly rely on the conclusory allegation that the defendants did not act "in accordance with the rules." These blanket allegations fail to put the defendants on notice of the conduct for which they are being sued, leaving them to defend this action by explaining all of their conduct during an indeterminate period of time. *See O'Brien, supra,* 936 F.2d at 676.

 The claims arising from the ODD also fail to state a claim under Fed.R.Civ.P. 12(b)(6). To state a claim under Section 10(b), plaintiffs must establish that defendants acted with scienter at the time that they misrepresented material facts. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976); *Healey v. Chelsea Resources, Ltd.,* 947 F.2d 611, 618 (2d Cir.1991); *Luce v. Edelstein,* 802 F.2d 49, 55–56 (2d Cir.1986). However, the Third Amended Complaint does not adequately plead that defendants acted with scienter at the time that the alleged misrepresentations in the ODD were made. Plaintiffs do not claim that OCC and CBOE intended to commit a fraud when the ODD was drafted and distributed in September 1986, but rather allege that the purported malfeasance occurred during the October 1987 market crash. Actions occurring in October 1987 simply cannot form the basis for an inference of scienter over a year earlier, in September 1986.

 Moreover, the claims relating to the ODD suffer from a more fundamental defect. Careful examination of the ODD reveals that it was not rendered false or misleading by the alleged omissions.[6] *Cf. Glazer v. Formica Corp.,* 964 F.2d 149, 153–57 (2d Cir.1992) (discussing materiality of omission in merger-acquisition context).

First, plaintiffs have not shown that any of the statements in the ODD were misleading when made. Simply stated, plaintiffs' claims in this action relate to alleged improprieties by the defendants in reacting to the emergency situation created by the market crash during the week of October 19, and there has been no allegation that the ODD, as drafted and distributed in 1986, was false and misleading. Further, to the extent that OCC and CBOE may have acted in violation of their rules during the week of October 19, which the defendants strenuously dispute, and to the extent that these violation may have rendered the disclosure in the ODD materially false and misleading, defendants had thirty days to distribute supplemental materials to remedy the alleged falsehoods contained therein, *see* S.E.C. Rule 9b–1, 17 C.F.R. § 240.9b–1(b)(2)(i), and plaintiffs have not pleaded any facts that demonstrate that this 30 day requirement was violated.

Second, the alleged falsehoods about which plaintiffs complain were addressed in the ODD. For example, the ODD provides that "[t]his booklet does not attempt to present a complete description of all of the technical provisions governing standardized options.... [or] the rules of options ... that govern the structure and conduct of the options markets." ODD, at 2. Thus, the ODD clearly stated that it was not intended to present an exhaustive explanation of the options trading system. The ODD also included an extensive discussion of the risks of options trading, *see* ODD, at 16–25, including the statement that "[t]he purchaser of an option runs the risk of losing his entire investment in a relatively short period of time." *Id.* Thus, the Court rejects plaintiffs' assertion that the ODD did not address the risks of options trading, and holds that the alleged omissions about which plaintiffs complain are not actionable under Section 10(b). *See Kramer, supra,* 937 F.2d at 775–78 (finding no failure to disclose risks); *O'Brien, supra,* 936 F.2d at 676–77 (same).

---

**6.** Consideration of the text of the ODD on this motion is proper because the document is incorporated by reference into the Third Amended Complaint. *See Kramer, supra,* 937 F.2d at 773–74.

■ Turning to plaintiffs' mispricing theory of the Section 10(b) claim, the Court also finds these allegations to be insufficient. The mispricing theory of the case relies on the proposition that defendants' conduct during the week of October 19 created a logjam that interfered with plaintiffs' ability to execute securities transactions, and led to an inflated margin call and the improper seizure of their accounts by Bear Stearns, thereby causing them injury. In examining this claim, the Court first notes that plaintiffs do not explain how the alleged acts of mispricing were false, and which rules were violated in the course of this alleged scheme. Thus, defendants are left to defend this action by justifying all of their pricing mechanisms during the week of October 19, in violation of Fed. R.Civ.P. 9(b).

■ A more fundamental defect in the Third Amended Complaint is plaintiffs' failure to allege that the mispricing purportedly committed by CBOE and OCC was integral to the purchase or sale of securities by the plaintiffs. As the Second Circuit has stressed, a successful claim under Section 10(b) "requires proof that the defendant's alleged fraud was 'integral to the purchase and sale of the security in question.' ... Section 10(b) is not violated by a fraudulent scheme that, some time after a purchase of securities, divests the purchaser of ownership. Rather, the fraud must have been integral to the plaintiff's purchase or sale of the security." *Flickinger, supra,* 947 F.2d at 598 (quoting *Pross v. Katz,* 784 F.2d 455, 459 (2d Cir.1986)) (citations omitted); *accord Rand v. Anaconda–Ericsson, Inc.,* 794 F.2d 843, 847 (2d Cir.) ("To fall within Section 10(b), misrepresentations must have some direct pertinence to a securities transaction."), *cert. denied,* 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); *see also Blue Chip Stamps v. Manor Drug*

*Stores,* 421 U.S. 723, 731–749, 95 S.Ct. 1917, 1923–32, 44 L.Ed.2d 539 (1975) (requiring seller or purchaser status to maintain suit under Section 10(b)).

The purportedly inflated margin call and the seizure of plaintiffs' accounts by Bear Stearns were not purchases or sales of securities by plaintiffs. Rather, plaintiffs' options transactions occurred before the allegedly fraudulent mispricing scheme, and any subsequent fraud that may have caused the divestiture of plaintiffs' ownership rights is not actionable under Section 10(b). *See Flickinger, supra,* 947 F.2d at 598. Thus, plaintiffs' assertion that "whether plaintiff [sic] made any securities transactions after the mispricing took place is simply irrelevant," Plaintiffs' Response, at 95, is incorrect as a matter of law. Moreover, the fact that plaintiffs were prohibited from purchasing or selling securities during the week of October 19 demonstrates that they are not among the class of plaintiffs intended to be benefitted by Section 10(b). *See Blue Chip Stamps, supra,* 421 U.S. at 737–39, 95 S.Ct. at 1926–27. The Court therefore dismisses the Section 10(b) claims stated by the plaintiffs in the Third Amended Complaint under Rules 9(b) and 12(b)(6).[7]

### 2. *Securities Act Sections 12(1) and 12(2)*

Plaintiffs also raise claims against the defendants under Sections 12(1) and 12(2) of the Securities Act, 15 U.S.C. § 77l, which provides that

Any person who (1) offers or sells a security in violation of section 5 [15 U.S.C. § 77e], or (2) offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary

---

7. To the extent that this conclusion differs from the holding in *Spicer v. Chicago Board Options Exchange,* No. 88 C. 2139, 1990 WL 172712 (N.D.Ill. Oct. 24, 1990), the Court respectfully declines to join in the holding of that case. Although *Spicer* denied a motion to dismiss claims brought under section 10(b), there simply are no allegations in the instant action to serve as the basis for an inference that OCC and CBOE knowingly made statements that were false at the time they were made, or that these defendants failed to provide supplemental information that was necessary to make the statements true in light of subsequent events. Moreover, *Spicer* was a class action suit in which market makers, like the plaintiffs in the case at bar, were excluded from the plaintiff class.

in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission) . . . shall be liable to the person purchasing such security from him.[8] Third Amended Complaint ¶¶ 171–195. Although the litigants have submitted extensive arguments concerning the sufficiency of these claims, *see, e.g.,* Plaintiffs' Response, at 28–73,[9] plaintiffs' allegations fail to meet the threshold requirements for actions under Sections 12(1) and 12(2), and these claims must be dismissed.

The purpose of Section 12 is to impose civil liability on those who sell or offer securities by means of disclosure documents containing untrue statements or misleading omissions, and on those who sell or offer securities without complying with applicable statutory registration and prospectus requirements. *See Pinter v. Dahl,* 486 U.S. 622, 641–42, 108 S.Ct. 2063, 2075–76, 100 L.Ed.2d 658 (1988); *Finkel,* supra, 962 F.2d at 172. Only those who purchase securities from sellers can recover under Section 12. *See Pinter, supra,* 486 U.S. at 643–45, 108 S.Ct. at 2076–77; *Cortec, supra,* 949 F.2d at 49. The definition of a seller for the purposes of Section 12 was addressed by the Supreme Court in *Pinter.* Rejecting a rigid construction of "seller," the Court held that liability under Section 12 extends beyond the party who formally "passe[s] title, or other interest in the security, to the buyer for value." 486 U.S. at 642, 108 S.Ct. at 2076. Thus, because "solicitation of a buyer is perhaps the most critical stage of the selling transaction. . . . [and] is the stage at which an investor is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information," liability under Section 12 extends to those who actively solicit offers to buy securities. 486 U.S. at 646–47, 108 S.Ct. at 2078; *accord Cortec, supra,* 949 F.2d at 49.

However, it also is clear that the definition of seller under Section 12 is not unlimited. The Supreme Court in *Pinter* specifically rejected extending the definition of "sellers" to include those with "substantial participation in the sales transaction,. . . . [as determined by] the defendant's degree of involvement in the securities transaction and its surrounding circumstances." 486 U.S. at 651, 108 S.Ct. at 2080; *accord Cortec, supra,* 949 F.2d at 49 (imposing liability "on only the buyer's *immediate seller;* remote purchasers are precluded from bringing actions against remote sellers" (emphasis in original)); *Royal American Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1017 (2d Cir.1989) (declining to extend liability under Section 12 to accountants and attorneys). In fact, plaintiffs' focus on the "economic realities" of the transaction, Plaintiffs' Response, at 34, closely resembles the "substantial participation" test rejected in *Pinter,* and would extend liability beyond those "immediate sellers" who actively solicit offers to purchase securities.

The Court next turns to determine whether the Third Amended Complaint has pleaded adequate facts to impose seller liability on the defendants under Section 12. Careful examination of the pleadings reveals that the plaintiffs do not allege that OCC or CBOE sold the options at issue in this case. *See* Third Amended Complaint ¶¶ 173, 176, 180, 191, 194. The only specific defendant that is alleged to have been a seller is "Bear Stearns, [which] purportedly sold to Pompano put options that, if sold by OCC on the CBOE, would have offset Pompano's options positions that had been purchased on the CBOE." Third Amended Complaint ¶ 173. Moreover, defendants' participation in the preparation of the ODD, *see* Third Amended Complaint ¶¶ 188–89, is not a sufficient basis for an inference that defendants "actively solic-

8. Plaintiffs allege two violations of 15 U.S.C. § 77e: selling securities without a registration statement, in violation of 15 U.S.C. § 77e(a)(1), and selling or delivering securities without the statutory prospectus required by 15 U.S.C. § 77e(b)(2).

9. Since Bear Stearns is not a party to this motion, the Court is perplexed by plaintiffs' prolonged discussion of Bear Stearns' liability under section 12. *See* Plaintiffs' Response, at 47–61.

ited" plaintiffs' purported options purchases. Thus, because plaintiffs' pleading does not allege that CBOE and/or OCC sold options, the claims under Section 12 must be dismissed.

██ Although "it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss," *O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 229 (S.D.N.Y. 1989), the Court also pauses to consider whether the allegations in Plaintiffs' Response are sufficient to impose seller liability under Section 12. According to Plaintiffs' Response, "[d]efendants marketed the options contract as a financial product which could be sold to investors like plaintiffs [and] Bear Stearns actively solicited plaintiffs' business.... Also, because of the manner in which defendants structured the options markets, they have made large profits from traders like plaintiffs." Plaintiffs' Response, at 34. In light of these claims, it is clear that plaintiffs have not alleged that OCC or CBOE were immediate sellers who actively solicited their purchases of options. *See also id.* at 48 ("Plaintiffs alleged that the options sold to Pompano on that day were issued and sold by Bear Stearns").

██ Moreover, because plaintiffs were not purchasers of securities, they do not have standing to bring suit under Section 12. *See, e.g., Cortec, supra,* 949 F.2d at 49. Rather, plaintiffs were option sellers, whose business was writing, or selling, and trading options on the floor of the CBOE. OCC's role in this process was only to issue the option to the clearing house member representing the option purchaser, after the sale had been made by the plaintiffs and the purchase had cleared on the CBOE. *See* Reply Memorandum of Chicago Board Options Exchange, Inc. and the Options Clearing Corporation in Support of their Motions to Dismiss Plaintiffs' Third Amended Complaint ("Defendants' Reply"), at 28. As explained by Judge Brieant,

A CBOE option is issued by [OCC] only after a buyer and a seller, acting through or for a member firm, have agreed on the floor of the CBOE to the price.... [T]he option is issued ... on the following business day if the full premium has been paid.... [F]or every outstanding option issued by the [OCC], there will be a writer who has agreed (by selling the option through his broker on the floor of the CBOE) to perform the [OCC's] obligation to deliver the underlying stock upon payment of the specified exercise price."

*Piemonte v. Chicago Board Options Exchange, Inc.,* 405 F.Supp. 711, 712 (S.D.N.Y.1975).

In fact, the caselaw is consistent in holding that "a seller of options, like plaintiff, is not a purchaser." *Panek v. Bogucz*, 718 F.Supp. 1228, 1231 (D.N.J.1989); *accord Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 644 F.2d 1194, 1196 (6th Cir. 1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982); *Prudential–Bache Securities, Inc. v. Cullather*, 678 F.Supp. 601, 605–06 (E.D.Va.1987); *cf. Mix v. E.F. Hutton & Co.,* 720 F.Supp. 8, 12 (D.D.C.1989) ("options trading is only awkwardly accommodated, if at all, under Section 12(2)"). Thus, an examination of both the pleadings and the reality of the relationship between plaintiffs and defendants reveals that CBOE and OCC were not sellers of options, and plaintiffs were not purchasers of options. Accordingly, the claims under Section 12 must be dismissed.[10]

### 3. *Securities Act Section 11*

██ Plaintiffs' eighteenth cause of action alleges a violation of Section 11 of the Securities Act, 15 U.S.C. § 77k, which "states that any signer, officer of the issuer, or underwriter may be held liable for a registration statement containing 'an untrue statement of material fact or omit[ting] to state a material fact ... necessary to make the statements therein not

---

**10.** The Court's conclusion that the ODD was not false or misleading serves as another basis for

the dismissal of the claims under section 12.

misleading.' " *I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991) (quoting 15 U.S.C. § 77k(a)); *accord Finkel, supra*, 962 F.2d at 173 (Section 11 "creates civil liability for false and misleading statements made in registration statements"); *Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 205 (2d Cir.1980). Section 11 imposes strict liability on the class of defendants listed therein in favor of those who purchase securities pursuant to registration statements containing material misstatements or omissions. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983).

However, plaintiffs' claims under Section 11 must fail. First, the Court already has held that plaintiffs were options sellers, rather than purchasers. The plaintiffs in the instant action simply do not have standing to maintain a suit under Section 11: in fact, the only potential litigants with standing to maintain a suit under Section 11 are the parties who purchased options from plaintiffs. Moreover, there has been no showing of the "material misstatement or omission [in the registration statement that is necessary] to establish [a] prima facie case." 459 U.S. at 382, 103 S.Ct. at 687.

■ The options at issue in the instant case were issued by OCC and traded on the CBOE in conjunction with a registration statement on Form S–20. *See* Exhibits to Plaintiffs' Memorandum in Opposition to Defendants' Motions to Dismiss the Third Amended Complaint, tab 6.[11] However, rather than relying on misstatements in the S–20, the Third Amended Complaint only alleges that the ODD was false. *See, e.g.*, Third Amended Complaint ¶ 97. Plaintiffs' claim that the purported falsehoods in the ODD can form the basis for liability under Section 11 is based on Rule 9b–1, 17 C.F.R. § 240.9b–1(b)(1), which provides that the "the use of an [ODD] shall not be permitted unless the options class to which such statement relates is the subject of an effective registration statement on Form S–20."

Thus, plaintiffs contend that the ODD was incorporated by reference into the S–20, and can be considered as the basis for an action under Section 11.

However, the fact that the ODD is part of the regulatory scheme with respect to options does not demonstrate that it was incorporated by reference into the S–20 for the purposes of Section 11. In fact, although 17 C.F.R. § 230.411(d) provides that "[a]n express statement that the specified matter is incorporated by reference at the particular place in the registration statement where the information is required," there is no explicit incorporation by reference in the S–20. *But see Spicer, supra*, slip op. at 35. Moreover, even if the ODD were incorporated into the S–20 by reference, the Court already has held that the ODD does not contain false and misleading statements. Accordingly, the claims under Section 11 must be dismissed.

### 4. *Exchange Act Sections 6, 17A and 19*

■ In the twelfth, thirteenth and fourteenth causes of action, plaintiffs allege that OCC and CBOE did not follow their internal rules of operation during the October 1987 market crash, in violation of Sections 6, 17A and 19 of the Exchange Act, 15 U.S.C. §§ 78f(b), 78q–1(b)(3) and 78s(g)(1), which set forth threshold requirements for the organization of and rules governing securities exchanges. Specifically, plaintiffs allege that CBOE "kept the OEX market open when the markets for the underlying securities were in chaos and did not permit orderly market operation.... [and] reopened the market as soon as possible despite a requirement not to resume trading unless the 'interests of a fair and orderly market are best served by a resumption of trading.' " Third Amended Complaint ¶¶ 157–58. Further, plaintiffs allege that "OCC imposed margin requirements on the basis of arbitrary and misleading prices in violation of its rules." *Id.* ¶ 160. According to plaintiffs, these

---

**11.** Consideration of the S–20 is proper on this motion because it is a public disclosure document on file with the SEC, that can be judicially noticed. *See Kramer, supra*, 937 F.2d at 774–75.

actions were taken "in order to maintain volume and excessive reserves which would have been lost if the markets were closed and fair prices were used. They did this to promote their own financial interests at the expense of the plaintiffs and other market participants." *Id.* ¶ 161.

Defendants move to dismiss these claims on five grounds. *See* Memorandum of Chicago Board Options Exchange, Inc. and the Options Clearing Corporation in Support of their Motions to Dismiss Plaintiffs' Third Amended Complaint ("Defendants' Motion"), at 35–56. The majority of defendants' arguments on these claims relate to the claim that no private right of action exists under Sections 6, 17A and 19, an issue that explicitly has been left open by the Second Circuit. *See Brawer v. Options Clearing Corp.*, 807 F.2d 297, 299 n. 2 (2d Cir.1986), *cert. denied*, 484 U.S. 819, 108 S.Ct. 76, 98 L.Ed.2d 39 (1987); *See also Kakar v. Chicago Board Options Exchange, Inc.*, 681 F.Supp. 1039, 1041–43 (S.D.N.Y.1988) (finding no private right of action under Exchange Act Section 6). However, because examination of the face of the Third Amended Complaint reveals that plaintiffs have not alleged that defendants acted with the requisite state of mind to impose liability under these sections, the Court disposes of these claims without reaching the difficult question whether a private right of action should be implied. *See Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *see also Thompson v. Thompson*, 484 U.S. 174, 188–91, 108 S.Ct. 513, 520–22, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring) (arguing that *Cort* has been overruled).

*Brawer*, which involved a plaintiff's allegations of irregularities in the trading of OCC options on the American Stock Exchange, addressed the mental state that must be pleaded and proved to prevail on an action which claims that a self-regulatory organization violated its internal, discretionary rules. As explained by the Second Circuit, "[c]ourts have consistently held that 'absent allegations of bad faith [an exchange and its officials] may not be held for discretionary actions taken in the discharge of their duties pursuant to rules and regulations of the exchange.'" *Brawer, supra*, 807 F.2d at 302 (quoting *P.J. Taggares Co. v. New York Mercantile Exchange*, 476 F.Supp. 72, 76 (S.D.N.Y.1979)). The bad faith standard also applies in cases "alleging violations of discretionary rules by the security exchanges." *Id.* The rationale for this standard is to further "the Congressional scheme of exchange self-regulation." *Id.*

In the Third Amended Complaint, plaintiffs have failed to delineate which CBOE and OCC rules were violated. However, the Court believes that plaintiffs allege a violation of CBOE Rule 24.7, which provides that "[t]rading shall ... be halted whenever the Exchange deems such action appropriate in the interests of a fair and orderly market and to protect investors [and] may resume if the Exchange determines that the conditions which led to the halt or suspension are no longer present and that the interests of a fair and orderly market are best served by a resumption of trading." Further, it appears that OCC is alleged to have violated OCC Rule 602A(b)(4), which provides that "the [OCC] may fix premium margin ... at such amount as it deems necessary or appropriate in the circumstances to protect the respective interests of Clearing Members, the Corporation, and the public." Because these rules clearly are discretionary, plaintiffs must allege that CBOE and OCC acted in bad faith to prevail on their claims under Sections 6, 17A and 19.

However, the Third Amended Complaint falls far short of alleging bad faith conduct. According to the plaintiffs, the challenged actions were taken "to maintain volume and excessive reserves ... [and] to promote [defendants'] financial interests at the expense of the plaintiffs." These averments are almost identical to the allegations found to be insufficient in *Brawer*, where the plaintiff claimed that defendants sought to "generate increased trading volumes and revenues." *Brawer, supra*, 807 F.2d at 303. As stated by the Second Circuit, such a "claim of bad faith [is] too remote and speculative. 'If such a degree of self-interest were allowed to demon-

strate bad faith, then exchange board members ... would inevitably be subject to bad-faith charges, and the concept of exchange self-regulation would be undermined.'" *Id.* (quoting *Sam Wong & Son, Inc. v. New York Mercantile Exchange,* 735 F.2d 653, 672 (2d Cir.1984) (Friendly, J.) (citation omitted)). Thus, because the plaintiffs have failed to plead facts sufficient to give rise to an inference of bad faith, the twelfth, thirteenth and fourteenth causes of action must be dismissed.

### 5. *Exchange Act Section 29(b)*

In addition to stating claims for substantive violations of the Securities Act and Exchange Act, plaintiffs' first, second and third causes of action seek to void certain contracts pursuant to Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc. Section 29(b) provides that

> Every contract made in violation of any provisions of this title or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) ... the performance of which involves the violation of, or the continuance of any practice in violation of, or the continuance of any relationship or practice in violation of, any provision of this title or any rules or regulations thereunder, shall be void.

To establish a violation of Section 29(b), the plaintiffs must "show that (1) the contract involved a 'prohibited transaction,' (2) he is in contractual privity with the defendant, and (3) he 'is in the class of persons the Act was designed to protect.'" *Regional Properties, Inc. v. Financial and Real Estate Consulting Co.,* 678 F.2d 552, 559 (5th Cir.1982); *accord Pearlstein v. Scudder & German,* 429 F.2d 1136, 1149 (2d Cir.1970) (Friendly, J., dissenting), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971); *In re Gas Reclamation, Inc. Securities Litigation,* 733 F.Supp. 713, 733 (S.D.N.Y.1990). However, there are certain limits to the reach of Section 29(b). For example, "under § 29(b) of the Exchange Act, only unlawful *contracts* may be rescinded, not unlawful *transactions* made pursuant to lawful contracts." *Zerman v. Jacobs,* 510 F.Supp.

132, 135 (S.D.N.Y.) (Weinfeld, J.), *aff'd,* 672 F.2d 901 (1981). Further, rescission of a contract pursuant to Section 29(b) is not available without an underlying violation of the substantive provisions of the securities laws. *See National Union Fire Insurance Co. v. Turtur,* 892 F.2d 199, 206 n. 4 (2d Cir.1989).

In reviewing the claims under Section 29(b), the Court first notes that it is handicapped by plaintiffs' failure to delineate which contracts allegedly violated the securities laws. Although the Third Amended Complaint refers to the standardized options contracts issued by OCC, and to the fact that options are managed by OCC and traded on the CBOE, *see, e.g.,* Third Amended Complaint ¶ 30, the first, second and third causes of action do not aver when these contracts were executed, which of the litigants were parties to the contracts, and what terms and provisions of the contracts violated the securities laws. In fact, all of the claims in the first three causes of action directly relate to the seizure and liquidation of plaintiffs' accounts, which allegedly violated contracts between Pompano, East Wind and Bear Stearns. In the absence of allegations that OCC or CBOE executed or performed pursuant to specific voidable contracts, it is difficult for the Court even to review plaintiffs' claims.

Moreover, in contrast to plaintiffs' contention that "the contracts at issue here (standardized options contracts) were entered into in violation of numerous provisions of the Federal Securities Laws," Plaintiffs' Response, at 115, the Court already has determined that the allegations in the Third Amended Complaint do not state a violation of the securities laws by OCC and CBOE. Thus, for example, plaintiffs' allegations do not support claims under Section 10(b), because they fail to plead fraud with particularity, do not allege that the defendants knowingly made false statements or failed to correct any information that became false in light of subsequent events and do not allege that the fraud occurred in connection with the purchase or sale of securities. Further, the claims un-

der Sections 12(1) and 12(2) were dismissed because plaintiffs were not purchasers of securities, which is the class of plaintiffs that these provisions were intended to protect. Similarly, the claims under Section 11 were rejected because there was adequate and complete disclosure in the statutorily mandated registration documents. Thus, in the absence of a viable claim that the securities laws were violated, plaintiffs' claims under Section 29 must be dismissed.

### 6. *State Law Claims*

The Court next turns to consider defendants' motion to dismiss the fourth, tenth and eleventh causes of action, which arise under state common law principles of fraud, breach of contract and breach of fiduciary duty. The motions to dismiss these claims rest on two primary bases. First, defendants assert that the state law causes of action are preempted by the federal securities laws. Second, defendants contend that plaintiffs have failed to plead a claim under state law upon which relief can be granted.

In determining whether state law is preempted by a federal statute, the Court is guided by Congressional intent. *See Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990).

> Congress may pre-empt state law in several ways: "First, in enacting the federal law, Congress may explicitly define the extent to which it intends to preempt state law. Second, even in the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law."

*Rogers v. Consolidated Rail Corp.*, 948 F.2d 858, 859 (2d Cir.1991) (quoting *Michigan Canners & Freezers Association, Inc. v. Agricultural Marketing & Bargaining Board*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984)).

The Second Circuit has not addressed the issue whether the federal securities laws that govern options trading preempt state law. However, in *Golden Nugget, Inc. v. American Stock Exchange, Inc.*, 828 F.2d 586, 589 (9th Cir.1987), the Ninth Circuit reversed the district court's holding that state law was preempted by the securities laws, finding that "Congress probably did not intend that the SEC occupy the entire field of options regulation." Moreover, Section 28(a) of the Exchange Act, 15 U.S.C. § 78bb(a), provides that

> [t]he rights and remedies provided by this title shall be in addition to any and all other rights and remedies that may exist at law or in equity.... Nothing in this title shall affect the jurisdiction ... of any state over any security or any person insofar as it does not conflict with the provisions of this title or the rules and regulations thereunder.

In light of this provision, defendants face an uphill battle if they are to convince the Court that state law is preempted by the federal securities laws. However, in light of the fact that plaintiffs have failed to state a claim for relief under state law, the Court need not reach the difficult question of preemption.[12]

■■■ Plaintiffs' three state law claims sound in fraud, breach of contract and breach of fiduciary duty. "Under New York law, a common law fraud claim requires proof that plaintiff justifiably relied on a false misrepresentation of material fact made by defendants with intent to deceive, and that plaintiff was damaged thereby." *Flickinger, supra*, 947 F.2d at 599; *accord Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 250

---

**12.** The Court is unable to discern from the pleadings and briefs which State's law should be applied in this action. Although defendants are Illinois corporations, plaintiffs appear to have conducted their options trading through Bear Stearns, in New York. *See* Third Amended Complaint ¶¶ 13–15. In the absence of any ar-

gument on the choice of law issue, the Court relies on New York law, "[u]nder the principle that implied consent to use a forum's law is sufficient to establish choice of law." *Tehran–Berkeley Civil and Environmental Engineers v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir.1989).

N.E.2d 214, 217, 302 N.Y.S.2d 799, 803 (1969). The Court already has determined that the first cause of action in the Third Amended Complaint does not state a claim under Section 10(b), because plaintiffs have not alleged that the defendants misrepresented material facts with an intent to deceive. In fact, plaintiffs' common law fraud claims merely incorporate these earlier allegations by reference. *See* Third Amended Complaint ¶¶ 122–124. Thus, given that the scope of Section 10(b) parallels the liability that exists pursuant to principles of common law fraud, *see Chiarella v. United States*, 445 U.S. 222, 227–28, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980); *United States v. Chestman*, 947 F.2d 551, 560 (2d Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992), this Court's conclusion with respect to the claims under Section 10(b) applies with equal force when considering plaintiffs' common law fraud claims, and the fourth cause of action must be dismissed.

"A fiduciary relationship exists under New York law ' "when one [person] is under a duty to act for or to give advice for the benefit of another within the scope of the relation." ' " *Flickinger, supra*, 947 F.2d at 599 (quoting *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 168, 521 N.Y.S.2d 672, 676 (1st Dept.1987) (citation omitted)). However, plaintiffs have not alleged facts sufficient to yield an inference that defendants owed them a fiduciary duty. *See* Third Amended Complaint ¶¶ 128–130. Moreover, given the Court's finding that defendants did not violate their internal rules, and the fact that the Third Amended Complaint focuses primarily on Bear Stearns' malfeasance, it is clear that plaintiffs have failed adequately to allege that defendants are liable for a breach of fiduciary duty. *See Flickinger, supra*, 947 F.2d at 599 (quoting *Horn v. 440 East 57th Co.*, 151 A.D.2d 112, 120, 547 N.Y.S.2d 1, 5 (1st Dept.1989)); *see also Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, C.J.); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir.1989) (citing *Meinhard*). Accordingly, the eleventh cause of action, for breach of fiduciary duty, must be dismissed.

▬▬▬ Finally, the Court turns to the breach of contract claim. To state a claim for breach of contract under New York law, the plaintiffs must plead the existence of a contract between the parties, breach and damages. *See, e.g., Litton Industries, Inc. v. Lehman Brothers Kuhn Loeb Inc.*, 767 F.Supp. 1220, 1227 (S.D.N.Y.1991). Turning to the first consideration, plaintiffs allege that "OCC had a direct contractual relationship to Pompano because of Pompano's market maker status. OCC, Bear Stearns and Pompano were in direct privity through a three-way agreement entitled "Combined Market Makers', Specialists' and Registered Traders' Account Agreement.... OCC also had contractual obligations to Pompano by virtue of the options contracts themselves." Third Amended Complaint ¶¶ 147–148. Careful examination of the pleadings reveals the absence of an allegation that plaintiffs had a contract with OCC, or that plaintiffs were third party beneficiaries of a contract to which OCC was a party. *See Flickinger, supra*, 947 F.2d at 599–600. Thus, the breach of contract claims fail to state a claim upon which relief can be granted.

Moreover, assuming, *arguendo*, that there was a contractual relationship between OCC and the plaintiffs, there has been no allegation that the contract was breached. Plaintiffs' allegations of breach rely on the proposition that "OCC violated its own rules repeatedly during the week of October 19 and knew or should have known of the CBOE Rule violations. As a result it breached its contract with Pompano." The only rules that plaintiffs claim were breached by the defendants relate to margin calls and trading halts. *See* CBOE Rule 24.7, OCC Rule 602A(b)(4). However, based on the discretionary nature of these rules, the Court determined, *supra*, that the plaintiffs had not adequately alleged the existence of rules violations. Given the absence of a contractual relationship and of viable allegations of rules violations in the Third Amended Complaint, the Court is drawn to the conclusion that plaintiffs have not stated a claim for breach of contract against OCC, and the tenth cause of action is dismissed.

## C. Dismissal With Prejudice

Finally, the Court holds that the Third Amended Complaint should be dismissed with prejudice. Under Fed.R.Civ.P. 15(a), leave to amend "shall be freely given when justice so requires." Rule 15(a) is interpreted liberally, and dismissal of an action is almost always accompanied by leave to replead. *See Richardson Greenshields Securities, Inc. v. Lau*, 825 F.2d 647, 653 n. 6 (2d Cir.1987); *Luce, supra*, 802 F.2d at 56. However, dismissal with prejudice is proper if it is "based on a valid ground." *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir.1990); *accord Cortec, supra*, 949 F.2d at 48. When a complaint is defective to such an extent that "it would be futile to grant leave to replead," dismissal with prejudice is proper. *Id.* at 50. Moreover, dismissal of a complaint with prejudice is proper when the complaint has been amended previously. *See McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir.1992); *O'Brien, supra*, 936 F.2d at 676–77; *Ronzani, supra*, 899 F.2d at 198 ("Since [plaintiff] had not previously been given leave to amend ... we hold that the court abused its discretion in dismissing the complaint without leave to amend."). The determination whether to grant leave to amend "is reserved to the discretion of the district court." *McLaughlin, supra*, 962 F.2d at 195.

In the case at bar, there are compelling reasons for dismissing the Third Amended Complaint with prejudice. First, it would be futile to grant leave to replead in this case. For example, plaintiffs' claims of securities fraud were dismissed because, *inter alia*, plaintiffs were not purchasers, defendants were not sellers and the alleged fraud was not committed in connection with the sale of purchase of securities. Given these findings, there are no facts that plaintiffs can allege to rescue these claims. Similarly, exhaustive examination of the disclosure documents and the contracts governing the relationships between the litigants revealed that the defendants adequately disclosed the risks that were known to them, and acted well within the bounds of the discretionary rules governing the disputed issues in this action.

Moreover, despite three previous amendments to their pleadings, plaintiffs still have failed to state a claim against these defendants upon which relief can be granted. Of course, the Court recognizes that this Opinion and Order represents the first judicial scrutiny of plaintiffs' claims against OCC and CBOE. However, the Third Amended Complaint was submitted only after a motion to dismiss the Second Amended Complaint became fully submitted, and was drafted at a time when plaintiffs were fully aware of the bases upon which the defendants were going to challenge their pleadings. Moreover, plaintiffs offered no additional facts in their briefs to lead the Court to believe that granting leave to replead would not be futile.

## CONCLUSION

For the foregoing reasons, Bear Stearns' motion to confirm the Arbitration Award hereby is granted, and plaintiffs' motion to vacate the Award hereby is denied. The claims asserted against OCC and CBOE in the Third Amended Complaint hereby are dismissed in their entirety.

SO ORDERED